[No. 10167.    Department One.    October 10, 1912.]

THE STATE OF WASHINGTON, *on the Relation of Ham,*
*Yearsley & Ryrie, Plaintiff,* v. THE SUPERIOR
COURT FOR GRANT COUNTY, *R. S. Steiner,*
*Judge, Respondent.*[1]

WATERS—IRRIGATION—RIGHT TO APPROPRIATE. The right to appro-
priate land for an irrigation project depends upon the appropriator's
right to the water to be used in such project.

NAVIGABLE WATERS—RIPARIAN OWNERS—RIGHT OF APPROPRIATION
—CONSTITUTIONAL PROVISIONS. In view of Const., art. 17, § 1, assert-
ing title in the state to the beds and shores of all navigable waters,
including the line of high water in navigable lakes, the riparian
owner on a navigable lake has no common law right as such owner
to the waters of the lake for the purposes of irrigation superior
to the right of appropriation possessed by owners of land not border-
ing upon the lake under the laws of the state relating to the ap-
propriation of water for irrigation; and it is immaterial that such
riparian rights are based upon titles from the general government
prior to the adoption of the state constitution.

SAME—STATUTORY PROVISIONS. The riparian owner on a navi-
gable lake is not given any right superior to others to appropriate the
water thereof for the purpose of irrigation, by Rem. & Bal. Code,
§§ 6325, 6326, in the act entitled an act providing for condemna-
tion proceedings for right of way for irrigation and relating to the
right of appropriation of water, which provides that any person is
entitled to appropriate water for irrigation, if not otherwise appro-
priated, and that all owners on the banks of any stream or water
course shall be entitled to the use of water therefrom, not other-
wise appropriated, for the purposes of irrigation to the full extent
of the soil for agricultural purposes.

SAME.    Rem. & Bal. Code, § 6338, providing that all persons on
the "margin, brink, neighborhood or precinct" of any lake shall
have the right to place upon the bank a wheel, steam pump, or other
machine for the purposes of raising the water to the level required
for irrigating the land, does not give a riparian owner any right to
appropriation superior to the right of other owners not bordering
upon the lake, other than the right of appropriation common to all.

WATERS AND WATER COURSES — APPROPRIATION FOR IRRIGATION —
NOTICE—NECESSITY. One who failed to post any notice of appro-

[1]Reported in 126 Pac. 945.

priation of water as required by statute, cannot, in the absence of any physical appropriation of the water, claim any prior appropriation thereof, as against one who had posted notice and prosecuted preliminary work.

SAME—NOTICE — RELATION — DILIGENCE — STATUTORY PROVISIONS. Under Rem. & Bal. Code, §§ 6317-6319, requiring the appropriator of water for irrigation to post notices and commence construction work for storage within three months, and if by diversion, to commence excavation work within six months, and that on a strict compliance with the rules, the rights shall relate back to the time of posting notice, and on failure to comply therewith, the rights shall be subject to the right of a subsequent appropriator faithfully complying with the same, the rights after posting notice depend upon such reasonable diligence in prosecuting the work as to clearly show an intent not to abandon the appropriation, as by the expenditure of $10,000 in preliminary work of great magnitude, requiring an entire season; and no want of diligence short of abandonment can be asserted by any one except a subsequent appropriator.

SAME—NOTICE—VALIDITY—TRESPASS.    The posting of notices of appropriation of the waters of a lake, upon the unoccupied land of another near the shore line of the lake is not such a trespass as to amount to an unlawful initiation of the appropriation.

Certiorari to review a judgment of the superior court for Grant county, Steiner, J., entered January 10, 1912, upon findings in favor of the defendant, denying the right to condemn lands for an irrigation project.   Reversed.

*Voorhees & Canfield,* for relator.

*E. J. Cannon* and *Graves, Kizer & Graves,* for respondent.

PARKER, J.—The relator has caused to be brought to this court by writ of certiorari, for review, a judgment of the superior court for Grant county, denying to it the right to condemn and acquire by right of eminent domain a tract of land belonging to the Northern Pacific Railway Company and R. F. Pettigrew, upon which to construct a dam for use in connection with, and as a part of, certain irrigation works which it proposes to construct.

The relator's right to acquire this land by condemnation rests upon its right to the water which it proposes to use in its irrigation project. That is, if it has lawfully acquired by appropriation the right to so use the water, it then has the right to acquire the land by condemnation in aid of its irrigation project. Otherwise it has no such right to so acquire the land, since its public use of the land rests upon its ability to use it as a part of its irrigation works, and, of course, it can have no irrigation works if it has no water therefor. The right to the water being the controlling question in the case, we will review the facts disclosed by the record, with a view to the determination of the relator's right thereto.

The relator is a domestic corporation, with power to acquire water rights and to construct, own and operate irrigation works, such as are here involved. It is the owner of a large quantity of land, aggregating some 25,000 acres, lying in a southwesterly direction, and at a distance of from 14 to 20 miles, from the southerly end of Moses lake, in Grant county. This is semi-arid land, but is capable of being rendered very productive by irrigation. A large portion of this land is capable of irrigation by gravity from Moses lake, and a large portion of it is capable of irrigation from the same source by pumping; provided a sufficient quantity of water therefor can be collected and stored in the lake for such use during the seasons when needed for that purpose. The Northern Pacific Railway and R. F. Pettigrew are the owners of the land which the relator seeks to condemn for its dam location, bordering upon the shores of the lake, and are also the owners of a large quantity of land aggregating in amount approximately the same as the land owned by the relator. This land lies within a distance of some two or three miles of the shores of the lake, and a large part of it lies immediately bordering upon the shores of the lake. The record title to this land is in the Northern Pacific Railway Company, and R. F. Pettigrew has a con-

tract with the railway company for the purchase thereof. There will be no occasion to make any distinction between the rights of the railway company and Pettigrew as we proceed, so we will hereafter refer to the land as belonging to both.   This, like the land of the relator, is semi-arid land, a large part of it being capable of irrigation and thereby rendered very productive.   Very little if any of this land is capable of irrigation by gravity from the lake, but a large part of it is capable of irrigation by pumping therefrom, providing a sufficient quantity of water can be collected and stored in the lake for such use during the seasons when needed for that purpose.   It is conceded that all of the available water which can be collected and stored in the lake will be needed for the proper irrigation of either the land of the railway company and Pettigrew or the land of the relator. There is, therefore, not here involved any question of the apportionment of such water.

Moses lake is an inland body of fresh water some fifteen miles long in a northerly and southerly direction, is of an average width of about one-half mile, is at present from ten to thirty feet deep, and is navigable.   Its shore lines were meandered by the United States government survey, and the uplands bordering thereon were patented by the government accordingly, to the railway company and others. It is therefore plain that all of the bed and shore lands of the lake are subject to the ownership of the state as asserted by article 17 of the state constitution.   The general slope of the country, both to the north and to south of the lake, is southerly.   Some distance to the north is a stream called Crab creek, into which several other streams flow.   This is a considerable system of water courses.   The water of these streams do not ordinarily reach the lake over the surface, but in seasons of high water their waters do occasionally reach the lake over the surface.   The lake is also fed by another stream flowing into it from the north, and is probably also fed to some extent below the surface of the ground.

Whatever surface outlet the lake ever had was evidently at the southern end, where the slope of the country continues southerly and falls below the surface of the lake at a comparatively short distance from that end. Prior to the year 1904, the lake had no surface outlet within the memory of man.

Running across the southerly end of the lake and reaching to the higher land on the east and west, the ground is elevated but little above the surface of the lake, and is composed largely of sand dunes, which up to that time held the water from flowing to the lower ground to the south. In that year the flood waters from Crab creek and its tributary streams caused the water of the lake to raise sufficient to flow over the lowest place in the sand dunes at its southerly end, when the water cut a channel there through which it continued to flow, lowering the lake below its prior normal level some eight or ten feet. Thus there was first formed the only surface outlet to the lake known to man. The purpose of the relator is to store water in the lake by raising the water to its former normal level, for use in irrigating its lands, and also the lands of others lying southerly and southwesterly from the lake. To this end it is necessary to construct a dam at the outlet formed by the overflow of 1904. To acquire sufficient land upon which to construct such a dam, the relator commenced condemnation proceedings in the superior court for Grant county against the railway company and Pettigrew, the owners of the land at that point; and it is the judgment of that court denying the right of the relator to condemn such land which is sought by the relator to be reversed.

We have already noticed that the relator's right to condemn this land for its dam depends upon its right to the water. This right it claims by prior appropriation rested upon the posting and recording of appropriate notices, and the commencement and prosecution of work in pursuance thereof. The railway company and Pettigrew resist the

claims of relator, claiming right to the water of the lake themselves by virtue of being owners of the upland bordering thereon, and by prior appropriation; and also claiming that the relator has not acquired any right to the waters of the lake by its claimed acts of appropriation, because of the insufficiency of such acts to constitute a lawful appropriation, even if it could so lawfully acquire such right as against them.   The claim of prior appropriation of the water, made by the railway company and Pettigrew in the trial court, was rested to some extent upon certain posted notices of appropriation.   Those notices were, however, held by the trial court to be unavailing to them, and they are not here making any further claim under those notices.   So far as their present claim by prior appropriation is concerned, they rest it upon certain work done by them looking to the impounding of water in the lake for the purpose of irrigating their land.

The claims of the railway company and Pettigrew to the water of the lake is rested largely upon the fact that they are the owners of land bordering upon the shores thereof.   This fact, it is contended by their counsel, gives them all the rights of riparian owners in the water of the lake, as if the water flowed in an unnavigable stream over their land, and they being in need of all of the available water to irrigate their land, that no part of it is subject to appropriation by owners of land which does not border upon the lake.   Thus is presented the question, Has the owner of upland bordering upon the shore line of an inland fresh water navigable lake any right to the water of such lake for the purpose of irrigating his land bordering thereon, superior to the right of appropriation possessed by owners of land which does not border upon the shore line of the lake, under the laws of the state relating to the appropriation of water for irrigation?   The railway company and Pettigrew claim the water as riparian owners of the land, first, by virtue of their common law rights; and second, by

virtue of certain statutes of the state which they insist amount to a grant of a right of that nature to the owners of land bordering upon navigable water. We will notice these two grounds of their claims in this order.

The declaration of our state constitution contained in § 1, art. 17, thereof, that:

"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes,"

and the decisions of this court touching the force and effect of that constitutional declaration, it seems to us fully answers in the negative the contentions of the railway company and Pettigrew, in so far as their claims are rested upon their asserted common law riparian rights.

In the early case of *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632, in considering the claimed right of an upland owner on tide lands bordering upon his land, and also the claimed right of such owner to access to navigable water over such tide land as against the state's grantee thereof, the court, resting its conclusions upon this constitutional declaration of ownership in the state, in so far as the upland owner's claimed common law right was concerned, at page 253 said:

"The result of our investigation of the authorities leads us to the conclusion that riparian proprietors on the shore of the navigable waters of the state have no special or peculiar rights therein as an incident to their estate. To hold otherwise would be to deny the power of the state to deal with its own property as it may deem best for the public good. If the state cannot exercise its constitutional right to erect wharves and other structures upon its public waters in aid of navigation without the consent of adjoining owners, it is obviously deficient in the powers of self-development, which every government is supposed to possess—a proposition to which we cannot assent. See *Galveston v.*

*Menard*, 23 Tex. 349. Nor do we think this view in any way conflicts with the constitution of the state, but, on the contrary, we believe it is in strict harmony with it, when all its parts are construed together. We cannot think that the building by the state or its grantees of wharves upon shores of navigable waters would constitute either a taking or damaging of private property for public use, in contemplation of the constitution."

And in the case of *Brace & Hergert Mill Co. v. State,* 49 Wash. 326, 95 Pac. 278, where there was similarly involved the claimed right of an upland owner of land bordering on a navigable fresh water lake, the decision was adverse to such claim, the court at page 330 observing:

"The contention is that the upland owner on a navigable body of water has, in virtue of his patent from the United States, the right of a riparian proprietor in the water on which his lands borders—a right which the state cannot by its laws take away. This question, in so far as it is within the powers of the courts of this state to determine it, has been determined against the appellant's contention. In its constitution the state asserted ownership in the beds and shores of all navigable waters of this state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes. By a uniform course of decision this court has held that this declaration vested title in the lands claimed in the state."

Citing the numerous previous decisions of this court dealing with the claims of upland owners bordering upon both salt and fresh water. Since the rendering of that decision, the doctrine of the *Eisenbach* case has been recognized as the settled law of the state in the following cases: *Grays Harbor Boom Co. v. Lownsdale,* 54 Wash. 83, 102 Pac. 1041, 104 Pac. 267; *Lownsdale v. Grays Harbor Boom Co.,* 54 Wash. 542, 103 Pac. 833; *Gifford v. Horton,* 54 Wash. 595, 103 Pac. 988; *Austin v. Bellingham,* 69 Wash. 677, 126 Pac. 59.

Counsel for the railway company and Pettigrew call our

attention to, and place special reliance upon, our decisions in *New Whatcom v. Fairhaven Land Co.*, 24 Wash. 493, 64 Pac. 735, 54 L. R. A. 190, and *Madson v. Spokane Valley Land & Water Co.*, 40 Wash. 414, 82 Pac. 718, 6 L. R. A. (N. S.) 257. It is argued that these decisions are, in effect, holdings that there are private rights of a riparian nature in the waters of navigable lakes. A critical examination of those cases however will show that the riparian rights which were there involved were not riparian rights in navigable water nor rights in water upon unpatented shore land, but riparian rights in water which was actually flowing over or resting upon land the title to which was in the owners claiming such riparian rights. In the *New Whatcom* case, the owner of the land was seeking simply to preserve his riparian rights in water which was flowing in an unnavigable stream over his land. It is true that a short distance above his land the stream emerged from a navigable lake, and it was the interfering with the waters of the lake that interfered with the natural flow of the water in the stream over his land. It was argued from these facts that since the interference with or diversion of the water from the lake was the diversion of navigable waters, it was, therefore, not an interference with the riparian rights of the owner, since he had no riparian rights in the lake. It was held, however, that notwithstanding the owner had no riparian rights in the lake, he did have riparian rights in the water flowing in the stream from the lake over his land, and those rights could not be interfered with to his damage, even though such interference was accomplished indirectly by the diversion of navigable waters. Had he been the owner of land bordering directly upon the lake, claiming riparian rights in the lake as such owner, the question now before us would have been involved. The *Madson* case will be best understood by a quotation therefrom. At page 417 the facts of that case are stated as follows:

"To the northwest from the main body of the lake, an arm of the lake extends over and across lands owned by respondents. These lands were acquired by a patent from the United States in October, 1886, before the adoption of the state constitution. No part of this arm of the lake lying upon respondents' land has ever been navigable for any purpose. The appellant, or its predecessors in interest, in the year 1899, entered upon the arm of the lake to the east of respondents' lands, between said lands and the main body of the lake, and constructed a dam across said arm and erected head gates therein, and to the west of respondents' lands constructed a canal from the arm of the lake to lands to be irrigated. The effect of the dam and the said canal is to withdraw the water of Liberty lake entirely from respondents' premises, so that respondents' access to the water on their land has been entirely destroyed, except for water which is permitted to run through the head gates during the irrigating season."

This case was decided in favor of the riparian claimant, upon the authority of the *New Whatcom* case. It will be noticed that title to the land upon which the nonnavigable water of the arm of the lake rested was acquired by patent from the United States before the adoption of our constitution, and therefore falls within the disclaimer of our constitution found in § 2, art. 17 thereof, as follows:

"The state of Washington disclaims all title in and claim to all tide, swamp, and overflowed lands patented by the United States."

It is manifest that this water could not be interfered with under the guise of diverting navigable water, any more than if it were flowing over land of the claimant through an unnavigable stream. Thus it will be seen that these are not cases of an upland owner claiming riparian rights in navigable water or in the shore lands thereof, but simply cases of claims of riparian rights in nonnavigable water actually flowing over or resting upon lands the title to which was in the person claiming riparian rights therein. No decision of this court has come to our notice dealing directly with

a claim of water for irrigation made by an upland owner by reason of such land bordering upon navigable water; but it seems to us that our constitutional declaration of ownership, and former decisions touching the effect of that declaration, are clearly opposed to the contention that an upland owner can make lawful claim to the use of navigable water upon which his land borders, and rest such claim solely upon the ground that he has a common law right in such water by reason of his land bordering thereon, as against the state or one who appropriates such water in pursuance of the laws of the state.

Our attention is called to certain of our prior decisions dealing with the right of upland owners to have access to navigable waters for purposes of navigation, among which the following may be noted: *Dawson v. McMillan,* 34 Wash. 269, 75 Pac. 807; *Monroe Mill Co. v. Menzel,* 35 Wash. 487, 77 Pac. 813, 102 Am. St. 905, 70 L. R. A. 272; *Burrows v. Grays Harbor Boom Co.,* 44 Wash. 630, 87 Pac. 937. Whatever the right of the railway company and Pettigrew may be to have access to the waters of Moses lake for the purpose of navigation, it is apparent that the appropriation to the extent here contemplated by the relator will not render the lake any less accessible to them for purposes of navigation than it is at present. So it becomes unnecessary to further notice that question.

Some contention is made in behalf of the railway company and Pettigrew rested upon the fact that the larger portion of the lands owned by them and upon which ownership they base their claimed common law rights was acquired by grant from the United States prior to the admission of the state to the Union and the adoption of our constitution; the argument being that such rights attached at the time of the grant and could not thereafter be lessened by any constitutional or statutory assertion of title on the part of the state. A similar contention was addressed to the court in the case

of *Kalez v. Spokane Valley Land & Water Co.*, 42 Wash. 43, 84 Pac. 395, where the court observed:

"The latter [appellant] contended that their grantors, having acquired the property from the government prior to statehood, became endowed with vested rights in and to the use of the waters and shores of said lake upon which their land abutted, and that the constitution and statutes of the state could not curtail those rights. It may be conceded that any vested rights possessed by their grantors and themselves could not be interfered with; but as this is a navigable body of water, the United States government, except for certain purposes in no manner involved here, could not dispose of the land below ordinary high water mark, but would hold said lands for the benefit of the future commonwealth which, upon attaining statehood, would become entitled to sovereignty thereover, and to the control and disposition of the waters, except where disclaimed by section 2, article 17, of the state constitution."

It is suggested that these remarks were largely dictum and not necessary in the decision of that case. There is some reason for that suggestion in view of the facts there involved. Nevertheless the view there expressed seems to be fully in accord with the views of the supreme court of the United States as expressed in *Shively v. Bowlby*, 152 U. S. 1. We are of the opinion that common law riparian rights in navigable waters, if it can be said that the common law recognized such rights, have not existed or been recognized in this state since the adoption of our constitution; at least so far as the upland owner having any right to occupy in any way the beds or shore lands of such waters or to take from such waters water for irrigation as against the state, its grantees, or those who have appropriated such water for purposes of irrigation in compliance with the laws of the state. This reduces our problem to one of prior appropriation as between the railway company and Pettigrew and the relator, since both have an equal right to appropriate the water regardless of their ownership of any particular lands, unless there is some statute law of the state giving to Petti-

grew and the railway company some right in the nature of a riparian right superior to that of the appropriation right sought to be exercised by the relator.

In addition to their claimed common law riparian rights, counsel for the railway company and Pettigrew insist that the statutes of the state give them a right to this water for irrigation of their land, which right is in the nature of a riparian right, superior to any appropriation right which can be exercised by the relator. This claim is rested upon §§ 6325 and 6326, Rem. & Bal. Code, taken from the Laws of 1899, p. 261. We quote both from the title of the act and the body thereof, since the title will aid us in arriving at the intention of the legislature in defining the water rights there mentioned. The title and §§ 1 and 2 are as follows:

"An Act providing for condemnation proceedings for right-of-way for irrigating ditches, canals, and flumes for agricultural and mining purposes and relating to right of appropriation of water.

"Be it enacted by the Legislature of the State of Washington:

"Section 1. That any person, corporation or association of persons is entitled to take from the natural streams or lakes in this state water for the purposes of irrigation and mining, not theretofore appropriated or subject to rights existing at the time of the adoption of the constitution of this state, subject to the conditions and regulations imposed by law: Provided, That the use of water at all times shall be deemed a public use, and subject to condemnation as may from time to time be provided for by the legislature of this state.

"Sec. 2. All persons who claim, own or hold possessory right or title to any land, or parcel of land or mining claim within the boundaries of the state of Washington, when such lands, mining claims or any part of the same are on the banks of any natural stream of water, shall be entitled to the use of any water of said stream not otherwise appropriated for the purposes of mining and irrigation to the full extent of the soil for agricultural purposes."

It will be noticed that, in addition to referring to rights of way for ditches, canals and flumes, the title concludes: "and relating to right of appropriation of water." The first section seems to be broad enough to give the right of appropriation to all persons for irrigation who are able to devote the water to such use. It might seem, therefore, unnecessary for the statute to define the rights of the persons mentioned in the second section, if it was only intended to give such persons the right of appropriation as distinguished from rights in the nature of riparian rights of upland owners; but even the right there granted, it will be noticed, is only to water "not otherwise appropriated for the purposes of mining and irrigation to the full extent of the soil for agricultural purposes." It may not be easy to see the purpose of the legislature in thus defining the rights of certain upland owners in a separate section from that in which it defines the rights of others. Such a division of the subject does seem to suggest that the rights of the upland owner were intended to be in some degree different from those of other appropriators; but reading the two sections together and having in mind the language of the title, which tells us that the act relates to the right of appropriation of water, we are constrained to hold that it was not intended thereby to confer or define any rights of a riparian nature, nor give to the upland owner any different right to take water from navigable streams than the right of appropriation which may be exercised by all persons. Our attention is also called to § 6338, Rem. & Bal. Code, which provides:

"All persons on the margin, brink, neighborhood, or precinct of any natural stream or lake of water shall have the right and power to place upon the bank of such stream or lake a wheel, steam pump, or other machine for the purpose of raising water to the level required for the use of such water in irrigating land."

We are unable to see how this section can avail the railway company and Pettigrew in their claim of superior right, since

it does not purport to give to the upland owner any different right than that possessed by other landowners whose land is in the "neighborhood" of the water. We think that this section, like those above discussed, confers upon landowners nothing more than an equal right of appropriation with others, regardless of their land bordering upon the shore line. We conclude that the right of the railway company and Pettigrew and the relator to the waters of Moses lake, and to collect and store waters therein for the purpose of irrigation, is simply an equal right to exercise the rights of appropriation, and their respective rights are determinable by a solution of the question, Who has exercised the prior right of appropriation? We will now address ourselves to that question.

In December, 1908, and January, 1909, the relator caused to be made an investigation and preliminary survey for the purpose of determining the practicability of irrigating its land from the waters of Moses lake. Becoming satisfied therefrom that such irrigation was practical, at least to some extent, it caused a notice of appropriation of water of the lake to the extent of 1,000 cubic feet per second to be given, stating therein the intention to make a storage reservoir of the lake by means of a dam at its outlet and to divert the water at that point. This notice was posted at the point of intended diversion, on January 20, 1909, and thereafter duly recorded in the office of the auditor of Grant county. Thereafter further investigation led the relator to conclude that another point of diversion would be more desirable, and on February 8, 1909, it caused another notice of appropriation of the water of the lake to be posted and recorded, which was in substance the same as the first one, except that the intended point of diversion was therein stated to be at the most southern extremity of the lake, which point is a mile or more in a southeasterly direction from the outlet. This notice was posted at the stated point of intended diversion.

The relator thereupon caused survey to be immediately commenced and made for the location of its intended head

gates and ditch lines, from the last named point of diversion to its land, and caused a considerable amount of work to be done in the way of investigating the character of the ground bordering upon the southerly end of the lake and the proposed dam location at the outlet. This investigation consisted largely of sinking several holes called tèst holes, some of which were as much as 24 feet deep, at different points along and back from the shore of the southerly end of the lake, for the purpose of determining any possible underground flow or seepage of the water from the lake, and also to determine the nature of the foundation that might be necessary for the construction of the dam. The relator's engineer also made preliminary estimates based upon the surveys and information thus obtained, of the probable cost of constructing the dam, head works, pipe, flume and ditch lines necessary to the project, finding that it would require about three-quarters of a million dollars therefor, assuming that enough water could be stored to irrigate 20,000 to 25,000 acres during the seasons when needed. This work was done in the summer of 1909. It appears that at that time but little was known as to the amount of water that could be collected and stored in the lake for use during the seasons when needed. This problem was affected by the nature of the ground and sand dunes at the south end of the lake, as to the capability of this ground to hold the water to any considerable height above that which it then was, the possibility of collecting sufficient water to irrigate all of relator's land, and the amount of loss of water by evaporation, as well as by seepage or flow from the lake under the surface. The relator caused these matters to be investigated at considerable expense, for the purpose of determining the extent of the works it would ultimately construct; it being apparent that all the water that could be stored under any circumstances would be needed for its irrigation project. The flow of the surface water into the lake, and the flow of other streams which did not reach the lake over the surface but which were thought to affect the lake's supply

were measured and the matter of loss by evaporation was investigated at the relator's expense, though it was carried on under the direction of the United States government geological survey employees, they furnishing suitable appliances therefor. This investigation was prosecuted through more than one season, and up to the time of the hearing in the condemnation proceeding. It is apparent that it was necessary to continue the experiments testing the flow of the streams and the amount of evaporation, over at least one entire season, in order to secure reliable data thereon. This work was continued with considerable diligence during that period and up to the time of the hearing of the condemnation in February, 1911.

In the fall of 1910, considerable information had been accumulated upon the question of the possible water supply and evaporation, though the final report from the geological survey employees upon the water measurements and evaporation was not made by them until February, 1911. On July 6, 1910, the relator caused to be posted and recorded another notice of the appropriation of the waters of the lake, in substance the same as the former notices, except that this notice specified three additional points of intended diversion, and also specified the point of intended diversion at the extreme southern end of the lake as in the second notice. This notice was posted at the several specified points of the intended diversion. On September 27, 1910, the relator's engineer commenced a topographical survey of the ground and sand dunes around the southern end of the lake, and on October 4, 1910, located and commenced grading with teams and scrapers the site of its proposed dam at the outlet of the lake. This work was prosecuted until October 11, 1910, when further work by the relator was enjoined by the superior court for Grant county at the instance of the railway company and Pettigrew. The grounds of the injunction were that the work was being carried on upon the land belonging to them, without any right so

to do having been acquired by grant or condemnation. While the relator was at work on its dam on October 7, 1910, it filed its petition instituting condemnation proceedings in the superior court for Grant county against the railway company. and Pettigrew, to acquire the land upon which to construct their proposed dam. Service was had upon the defendants in that proceeding October 8 and 10, 1910. It is in that proceeding that the right of the relator to condemn was denied.

Up to and until the time of the commencement of the condemnation proceedings, the relator had expended for surveys, investigation of available water supply, the storage capacity of the lake, and the possible loss of water therefrom by evaporation, $10,000 or more. About one-half of this sum was spent in surveys preliminary to the construction of the works, and the other half in investigations of the nature mentioned. There is some conflict in the opinions of the engineers who testified for the respective parties as to the proper construction of the dam to hold the waters of the lake and as to the probable cost of such a dam, their estimates being from a few thousand to $80,000. Taking the evidence as a whole, however, there seems to be but little doubt that the entire project contemplated by the relator will require an expenditure of more than a half million dollars. There appears to be but little doubt of the practicability of the relator's project, to the full extent of the water that can be accumulated and stored for use during the seasons when needed. The only unsolved problem seems to be as to the amount of water that can be so accumulated and stored. No question is made as to the ability of the relator to carry the project through, so far as financing it is concerned.

Turning now to the claimed appropriation of the water made by the railway company and Pettigrew, we have already noticed that the trial court decided against all rights claimed by them under certain notice of appropriation, and that no claim is here made by them resting upon those notices. Petti-

grew entered into a contract with the railway company for the purchase of the land he now claims the water for, in December, 1909. He made some investigation of the land as to the possibility of irrigating it by pumping from the lake, in the winter of 1909 and 1910, but has made practically no investigation of the amount of water available therefor, nor of the storage capacity of the lake, nor were any surveys ever made by him locating ditch or flume lines.

In the latter part of September, 1910, Pettigrew caused to be located and staked upon the ground at the outlet of the lake a site for a dam he proposed to build. Some small amount of material was then brought for the commencement of its construction, and some little grading done by him a few days before the relator located its dam and commenced grading for its construction. Soon thereafter the injunction followed, resulted in stopping the relator's work, and, as we have noticed, the condemnation proceedings were commenced by the relator to acquire land for the location of its dam at about the same time. Since then Pettigrew has done considerable work upon his dam, but he has fallen far short of making an actual appropriation of the water, either by putting it to use for irrigation, or by completing the construction of such works as would enable him to so use the water when needed. He had no prior appropriation notice posted to which his work could relate back to upon its completion. Had he completed his works and actually been taking the water, we might then have a different question, so far as his rights as against the relator are concerned.

The question, then, upon this branch of the case is, Did the relator exercise such diligence as to prevent its right of appropriation being lost as against the rights of Pettigrew? If Pettigrew's work rested upon a prior posted notice of appropriation, we might have a question of prior appropriation as between the two. But because of want of notice of appropriation on the part of Pettigrew he could in no event be deemed a prior appropriator, at least not unless he had com-

pleted the physical appropriation of the water. This we think puts the relator in such a position that its acts looking to the construction of its work, must be viewed in the most favorable light, since we find its claim of appropriation resting upon valid posted notices, and at least some work performed in pursuance thereof, and no one else having initiated any such right by posting notices of appropriation nor made any actual consummated appropriation. This right of appropriation here involved, in order to be effective, must have been initiated under the provisions of §§ 6317, 6318 and 6319, Rem. & Bal. Code, which are as follows:

"Any person, persons, corporation, or association desiring to appropriate water must post a notice in writing in a conspicuous place at the point of intended storage or diversion, stating therein,—

"(1) That such appropriator claims the water lying, being, or flowing to the extent of one cubic foot of water per second of time, or some multiple or some fractional portion thereof;

"(2) The purpose for which said water is appropriated, and the place or places, as near as may be, of intended use;

"(3) The means by which it is intended to store or divert the same;

"(4) A copy of the notice must, within ten days after it is posted, be filed for record in the office of the county auditor of the county in which it is posted." § 6317.

"If said use is by storage, the appropriator must, within three months after the notice is posted, commence the construction of the works by which it is intended to store the same. If said use is by diversion, the appropriator must, within six months after the notice is posted, commence the excavation or construction of the works by which it is intended to divert the same; it being herein expressly provided that such works must be diligently and continuously prosecuted to completion, unless temporarily interrupted by the elements." § 6318.

"By a strict compliance to the above rules the appropriator's rights to the use of the water actually stored or diverted relates back to the time the notice was posted; but a failure to comply therewith deprives the appropriator of the right

to the use of the water as against a subsequent appropriator who faithfully complies with the same." § 6319.

It is plain from these provisions that no acts or work looking to an appropriation of water will cause the completed appropriation to relate back to the time of its actual accomplishment, except the posting and recording of appropriation notice be done as provided by §6317. It is therefore plain that Pettigrew's claimed acts of appropriation cannot, in any event, relate back in point of time to an actual consummated appropriation by him. On the other hand, the relator's rights, resting upon notices of appropriation, depend only upon its diligence in work performed looking to a completed appropriation, and when completed will relate back to the time of posting of notices. And in view of the fact that no one else has given notice of prior appropriation, the relator's diligence is not to be measured as against some other claimant's rights, but its diligence would seem to be sufficient to preserve its rights, if its work has been such as to clearly show an intention not to abandon its appropriation of the water. It is provided by §6319 that a failure to comply with the rules prescribed by these sections, "deprives the appropriator of the right to use the water as against a subsequent appropriator who faithfully complies with the same." It evidently is the legislative intent that such an appropriator will not lose his right of appropriation by mere want of diligence short of an abandonment of his claim, except as against a subsequent appropriator who complies with the provisions of these sections; and it is apparent there cannot be such an appropriator, except it be one who causes to be posted notice of appropriation, or, possibly, one who has made a completed physical appropriation of the water. We have neither in this case to come in conflict with the relator. It seems to us that, in view of this fact, the relator must have been so wanting in diligence in following its notice of appropriation by acts looking to the construction of its works, as to amount to a practical abandonment of its project, before we can say that it has lost the

right to proceed and complete its appropriation.  In view of
the diligence on the part of the relator, evidenced by its sur-
veys and investigation of the storage capacity of the lake,
the amount of water available for storage therein, and the
amount of possible loss of water by evaporation, we are of the
opinion that the relator has not lost the right to proceed with
its appropriation of the water.  An examination of the deci-
sions of the courts will show that the question of due diligence
on the part of an appropriator in performing work following
his notice of appropriation must rest largely upon the facts
and circumstances of each particular case.  The conditions
and necessities of different projects are so varying that it is
difficult to make more than a very general statement of a rule
of diligence applicable to all cases.  Probably as comprehen-
sive general statement of the rule as the law will warrant is
that found in the text in 40 Cyc., at page 711, as follows:

"The appropriator must proceed with reasonable diligence
to construct and complete such works as are necessary for the
immediate application of the water to the intended use.  What
is a reasonable time and what constitutes reasonable diligence
depend largely on the facts of the particular case  .  .  .
but it may be said that they depend chiefly on the physical
circumstances of the locality, the nature and condition of
the region to be traversed and its accessibility, the length of
the season in which work is practicable, the supply of labor,
and the magnitude and difficulty of the works neces-
sary.  .  .  ."

The following decisions are instances of the application of
the rule as thus very generally stated:  *Ophir Mining Co. v.
Carpenter*, 4 Nev. 534, 97 Am. Dec. 550; *Sieber v. Frink*,
7 Colo. 148, 2 Pac. 901; *Dyke v. Caldwell*, 2 Ariz. 394, 18
Pac. 276; *Nevada Ditch Co. v. Bennett*, 30 Ore. 59, 45 Pac.
472, 60 Am. St. 777; *Sand Point Water & Light Co. v. Pan-
handle Development Co.*, 11 Idaho 405, 83 Pac. 347; *Whited
v. Cavin*, 55 Ore. 98, 105 Pac. 396.

These cases involve conflicting claims of appropriation,
and it might well be argued that at least some of them would

support relator's claim, even if the claimed rights of the railway company and Pettigrew were based upon valid notices of appropriation.  In view of the magnitude and difficulties of the successful completion of the relator's project, we think that the work performed by it looking to the completion of its appropriation of the water was sufficient to preserve its rights to so appropriate the water.  It follows that in the prosecution of that work it has the right to acquire by eminent domain proceedings the land for the location of its dam.

We have arrived at this conclusion without taking into account in the relator's favor the work performed by it upon the construction of its proposed dam, which it was enjoined from prosecuting, since counsel for the railway company and Pettigrew insist that that work was performed in the commission of a trespass upon the land sought to be acquired, and should not, therefore, be taken into consideration as lending support to the relator's claim of appropriation of the water.  We find it unnecessary to express an opinion as to the relator's right to regard those acts as a part of the construction work for which he is entitled to credit as a part of his work looking to the appropriation of the water.  We think its other work has been sufficient to preserve its rights under the circumstances.

All of the relator's notices of appropriation were posted upon unoccupied land belonging to the railway company and Pettigrew, near the shore line of the lake, at the stated points of intended diversion.  This, it is contended by counsel for the railway company and Pettigrew, constitued such a trespass upon their land by the relator that it could acquire no right to the water based upon such notices as an initiation of such right.  They invoke the general rule that

"An appropriation cannot  be initiated unlawfully by a trespass upon private land, and no rights can be obtained thereby against the land owner whose land is trespassed upon." 1 Wiel, Water Rights in Western States (3d ed.), § 221.

As stated by Wiel in his work on Water Rights in Western States, vol. 1, § 221 (3d ed.), and also the general rule, the right of appropriation applies only to water upon public lands, as recognized by this court in *Sander v. Wilson*, 34 Wash. 659, 76 Pac. 280. A number of decisions have been cited by counsel for the railway company and Pettigrew illustrating the application of these rules. It seems to us, however, that counsel's argument is fully answered by the fact that the water right sought to be initiated and acquired by the relator is not a right to take water from the land of the railway company and Pettigrew, nor the right to take water to which they have any higher or different right to appropriate than the relator has. The relator is not seeking to condemn any water rights belonging to the railway company and Pettigrew. We have already seen that it is under no necessity of acquiring any of their water rights, since they, like it, possess only the right of appropriation which they have not lawfully exercised. That is, they have neither lawfully initiated nor consummated an appropriation.

When the relator caused the appropriation notices to be posted, it was not thereby seeking to acquire the ground upon which they were posted, but was seeking only to acquire a water right which it had an equal right with the railway company and Pettigrew and all others to acquire by appropriation. Now had the relator's notices of appropriation been posted below the shore line of the lake over the water, or on the land below the line of ordinary high water, they would then have been upon the state's land, and of course such posting would have been entirely free from the objections here urged. It is evident that they were posted sufficiently near the shore line and the designated point of diversion of the water to give legal notice of the intended diversion, storage and use of the water. They were posted upon land wholly unoccupied, and we find nothing in the record showing that they were ever interfered with by the railway company or Pettigrew, nor that the railway company or Pet-

tigrew ever objected to them being posted upon their land, nor was the possession and enjoyment of the land by the railway company or Pettigrew thereby in the least interfered with. No authority has come to our notice indicating that such a technical trespass would render appropriation notices so posted unavailing to the appropriator, where the water sought to be appropriated is not flowing upon nor riparian to the land thus technically trespassed upon. An examination of the decisions cited, illustrating the general rule that water appropriation rights and land preemption rights cannot be lawfully so initiated, will show that the decisions holding against the would-be appropriator or preemptor resting claims upon such an attempted initiation of rights, deal altogether with claims made by the trespasser to the identical property trespassed upon by him. Among the decisions called to our attention by the counsel for the railway company and Pettigrew, the following we think are as favorable to their position as can be found, and they belong to the class we have indicated: *Prentice v. McKay*, 38 Mont. 114, 98 Pac. 1081; *McGuire v. Brown*, 106 Cal. 660, 39 Pac. 1060; *Snyder v. Colorado Gold Dredging Co.*, 181 Fed. 62; *Atherton v. Fowler*, 96 U. S. 513. We are of the opinion that the posting of the appropriation notices on the land of the railway company and Pettigrew, under the circumstances here shown, did not render them unavailing to the relator as a lawful initiation of the appropriation of the water of Moses lake.

We conclude that the relator is only exercising its right of appropriation from the waters and land belonging to the state; that its exercise of such right is not in conflict with any private riparian rights, nor in conflict with any other prior lawfully initiated or consummated appropriation; and that the work performed by the relator has been such as to preserve its right to proceed with its work looking to a completed appropriation. It follows that the judgment of the trial court must be reversed, with directions

to allow the relator to acquire the land for the dam location by condemnation, upon payment of compensation therefor after being ascertained in the manner provided by law. It is so ordered.

FULLERTON, CHADWICK, GOSE, and MORRIS, JJ., concur.