## WASHINGTON *v.* OREGON.

No. 11, original. Argued February 10, 11, 1936.—Decided March 2, 1936.

Mr. *George G. Hannan,* Assistant Attorney General. of Washington, with whom *Mr. G. W. Hamilton,* Attorney General, and *Mr. Fred 'J. Cunningham* were on the brief, for complainant.

*Messrs. Charles Z. Randall* and *George T. Cochran,* with whom *Mr. I. H. Van Winkle,* Attorney General of Oregon, and *Messrs. James A. Fee* and *Colon R. Eberhard* were on the brief, for defendant.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

With leave of court (283 U. S. 801), the State of Washington filed a bill of complaint on July 22, 1931, in which it charged that the State of Oregon was wrongfully diverting the waters of the Walla Walla River to the prejudice of inhabitants of Washington, and prayed an adjudication apportioning the interests of the two states in the river and in tributary streams and restraining any

use or diversion of the waters found to be unlawful. To this complaint Oregon filed an answer containing denials and defenses, to which Washington replied. On February 20, 1933, this court appointed a Special Master with authority to take evidence and with directions to make findings of fact and conclusions of law to be submitted to the court with recommendations for a decree. 288 U. S. 592. The case is now here upon exceptions filed by Washington to the Master's report, which finds the facts fully and advises the dismissal of the bill.

The Walla Walla River, a non-navigable stream, rises in the Blue Mountains of northeastern Oregon. For about four miles above the City of Milton it flows through a narrow canyon, the waters for that reach being inaccessible for purposes of irrigation. At Milton the river broadens out in a delta formation. The first division in this formation is at Red Bridge, near the city, where the river breaks into two branches. One, the Tum-a-lum, as it is known in Oregon, or the main Walla Walla, as it is known in Washington, flows through cobble rocks over great depths of gravel till it reaches the McCoy Bridge. There, at the margin of an alluvial fan, springs rise from below the surface, and feed the flow anew. Thus reinforced, the stream moves northwesterly to the line between the two states, and again northwesterly for about thirty miles in Washington to its confluence with the Columbia River. A second branch of the river, starting at the Red Bridge, is known as the Little Walla Walla, which divides after a mile into the Crocket and the Ford. Prongs of the Crocket which contribute little, if any, water during the irrigation season, combine with another stream after crossing the state line, and discharge into the main river above the intake of the canal of the Gardena project. Another prong of the Crocket comes together with the Ford and joins the main river in Washington below the intake of the canal. Still another tribu-

tary, known as the Mill Creek, rises in the Blue Mountains, and flows far to the east of the courses just described. After breaking up into other creeks (the Yellowhawk, the Garrison and others), it joins the main stream of the Walla Walla within the state of Washington. No claim is made by the complainant that the waters of Mill Creek have been illegally diverted. Indeed, the fact appears to be that the inhabitants of Washington use the waters of that creek to the exclusion of any use thereof by the inhabitants of Oregon. The claim of wrongdoing has its centre in the use of the waters of the Walla Walla arising above the Red Bridge.

The Walla Walla Basin has a semi-arid climate with warm dry summers and cold wet winters. The streams contributing to the river are supplied in the main from the snows of the Blue Mountains. Upon the coming of spring, these snows are melted, and the river at that season attains its highest flow. Even then there are variations, not only from month to month, but from day to day. With the advance of summer, the flow diminishes greatly, particularly in the latter part of July and August. In such a climate agriculture cannot go on successfully without the aid of irrigation. A sporadic supply of water will not meet the farmer's needs. "To be available in a practical sense the supply must be fairly continuous and dependable." *Wyoming* v. *Colorado,* 259 U. S. 419, 471. A fair division of the water is thus vital to the prosperity of this agricultural community, and even to its life, for agricultural in the main it is. True, there are cities also within the limits of the watershed, Walla Walla in Washington with a population of 15,976; Milton and Freewater in Oregon with a combined population of 2,308.. Even so, the welfare of the cities is closely bound up with that of the area about them. Indeed, there has been a unity of growth in the development of the whole community, a development quite inde-

pendent of the dividing line between the states. As already pointed out, farmers in Washington have had the benefit of Mill Creek, which takes its rise in Oregon.

Complainant and defendant have stipulated that for the purposes of this case the individual rights of the respective land owners and water owners concerned in both states are governed by the doctrine of prior appropriation. *Wyoming* v. *Colorado, supra.* The Washington court made a decree in September, 1928, adjudging the priorities of appropriators in Washington. The Oregon court made one in August, 1912, adjudging the priorities of appropriators in Oregon. Neither state was a party to the judicial proceedings in the other. The stream supply has been sufficient through the aid of the Mill Creek to satisfy rights with priorities up to 1891 under each of the decrees. What Washington complains of chiefly is the deficiency in the supply available for the satisfaction of alleged priorities up to 1892. Particularly it complains of the deficiency of the supply for the Gardena Farms District. By the decree of September, 1928, the District was adjudged the holder of a water right with an 1892 priority for the irrigation of 7,000 acres upon specified conditions. This priority, though recognized in Washington, is contested by Oregon. The project affected by that award was started in 1892 by the Walla Walla Irrigation Company. A canal to connect with the Walla Walla River was to carry water for irrigation to a tract known as the Gardena District, twelve miles or more away. Work on the canal was slow and intermittent, chiefly for lack of funds. About 1903 the engineers discovered that the best land in the District could not be irrigated at all unless the plans were greatly changed. Thereupon a new system of construction was adopted following a different route. Not till 1904 or later was water in the canal applied beneficially to any acreage in Washington except in trifling quantities. Long

before that time, beginning in 1880 or earlier and continuously thereafter, irrigators in Oregon had been appropriating to themselves the waters of the river above the Red Bridge.

We turn at this point to a consideration of the acts of appropriation, their nature and effect, in an endeavor to ascertain whether they were legitimate or wrongful. For more than fifty years before the filing of this suit irrigators in Oregon at seasons of shortage maintained crude or temporary dams across the Walla Walla River close to the Red Bridge. During the low water period the effect of the dam was to turn the waters of the river away from the channel of the Tum-a-lum into the channel of the Little Walla Walla, where they were used for agricultural, domestic and kindred purposes. A small quantity of water necessary to supply the right of the East Side Ditch has been permitted to go by the dam without interference. With that exception, which is negligible, all the waters have been diverted without interruption and without protest for more than fifty years. Was this a wrong to Washington?

"Before this court can be moved to exercise its extraordinary power under the Constitution to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and it must be established by clear and convincing evidence." *New York* v. *New Jersey,* 256 U. S. 296, 309; *North Dakota* v. *Minnesota,* 263 U. S. 365, 374; *Connecticut* v. *Massachusetts,* 282 U. S. 660, 669; *Missouri* v. *Illinois,* 200 U. S. 496, 521. The Master has found: "There is no satisfactory proof that to turn down water past the Red Bridge in Oregon during the period of water shortage would be materially more advantageous to Washington users than to permit such water to be applied to surface irrigation in Oregon." This is so because of the nature of the channel of the Tum-a-lum River. During the pe-

riod of water shortage, only a small quantity of water would go. by if the dams should be removed. There is evidence that this quantity, small at the beginning, would be quickly absorbed and lost in the deep gravel beneath the channel. Experiments have proved that it would not reach the McCoy Bridge, only a few miles down the stream. As to this the Master finds: "The channel of the Tum-a-lum River between the Nursery Bridge [which is close to the Red Bridge] and the McCoy Bridge [farther down] is an extremely wasteful channel. Water turned past the Red Bridge sinks and becomes part of the underground waters." "To limit the long established use in Oregon would materially injure Oregon users without a compensating benefit to Washington users." These findings are well supported by the evidence. Complainant has brought forward no adequate reason for disturbing them. *Connecticut* v. *Massachusetts, supra,* at p. 669. Accepting them, as we do, we accept also the conclusion to which they point with inescapable directness. To restrain the diversion at the bridge would bring distress and even ruin to a long established settlement of tillers of the soil for no other or better purpose than to vindicate a barren right. This is not the high equity that moves the conscience of the court in giving judgment between states. *North Dakota* v. *Minnesota, supra; Connecticut* v. *Massachusetts, supra; Kansas* v. *Colorado,* 206 U. S. 46, 109. Far from being that, it is rather "the *summum jus* of power." *Mutual Life Insurance Co.* v. *Johnson,* 293 U. S. 335, 339. In default of reasons for removal more urgent and compelling, the tillers of the soil will be left where they have settled. Cf. *Hough* v. *Porter,* 51 Ore. 318, 415; 95 Pac. 732; 98 Pac. 1083; 102 Pac. 728; *Matheson* v. *Ward,* 24 Wash. 407, 411; 64 Pac. 520.

The question must still be met whether the waters when diverted are misapplied or wasted with ensuing loss

to the complainant. As to this the findings are explicit, and they are supported by the evidence. "The use of water by the irrigators within the State of Oregon is not unduly wasteful but is, under the circumstances, a reasonable, beneficial and necessary use." Nor does the evidence sustain the allegation of the bill that through the diversion of the stream and the application of the water to new irrigated lands the underground water supply has been so shifted to the west that it does not return to the river at such a point as to be usable by the inhabitants of Washington. As to this and other charges of damage or wrongdoing, the burden of proof falls heavily on complainant, more heavily, we have held, than in a suit for an injunction where states are not involved. *North Dakota* v. *Minnesota, supra; Connecticut* v. *Massachusetts, supra.* The burden has not been borne. On the contrary, the Master finds on the basis of supporting evidence that "a substantial part of the water applied to irrigation in Oregon . . . goes into the underground water supply," and returns to the river. Indeed, he goes farther and concludes that "the use of water for irrigation within the State of Oregon is beneficial to irrigators within the State of Washington," by feeding the many springs that supply the main river later in its course. Whether this is so or not, certain at least it is that the injury, if there is any, does not appear "by clear and convincing evidence" to be one "of serious magnitude." *Connecticut* v. *Massachusetts, supra; New York* v. *New Jersey, supra.* Between the high contending parties whose interests are involved, nothing less will set in motion the restraining power of the court.

Next to be considered is the practice of the defendant's farmers in sinking wells upon their farms. This is stated in the findings. "In addition to the surface water available for use within the State of Oregon, the farmers have tapped the subsurface water supply by sinking about

three hundred wells, from which wells they pump each year approximately 9,000 acre feet of water. The water so pumped is used upon the lands where the several wells are located." A different question would be here if the water when extracted had been sold or otherwise employed for use on distant lands. Such use is unlawful according to the rule in many courts (*Snake Creek Mining & Tunnel Co.* v. *Midway Irrigation Co.*, 260 U. S. 596, aff'g 271 Fed. 157; *Forbell* v. *New York City*, 164 N. Y. 522; 58 N. E. 644; *People* v. *New York Carbonic Acid Gas Co.*, 196 N. Y. 421; 90 N. E. 441; *Bassett* v. *Salisbury Mfg. Co.*, 43 N. H. 569; *Patrick* v. *Smith*, 75 Wash. 407; 134 Pac. 1076), though the decisions are not uniform. *Acton* v. *Blundell*, 12 M. & W. 324.[1] Again, a different question would be here if the waters, though subterranean, followed a defined channel, instead of percolating vagrantly through rocks and sand and gravel. *Snake Creek Mining & Tunnel Co.* v. *Midway Irrigation Co.*, *supra; Boyce* v. *Cupper*, 37 Ore. 256, 260; 61 Pac. 642; *Hayes* v. *Adams*, 109 Ore. 51, 57, 58; 218 Pac. 933; *Meyer* v. *Tacoma Light & Water Co.*, 8 Wash. 144; 35 Pac. 601; *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279; 202 Pac. 815; *Clinchfield Coal Corp.* v. *Compton*, 148 Va. 437; 139 S. E. 308. Here the water level is on such a slope that, without any pumping, gravity would take the water away from the channel of any stream, either above the surface or below it. In such circumstances the right to pump in reasonable quantities for the beneficial enjoyment of the overlying land is allowed even by those courts that have placed the narrowest restrictions on the use of percolating waters. *Maricopa County District* v. *Southwest Cotton Co.*, 39 Ariz. 65, 86, 90, 97, 100; 4 P. (2d) 369; *Los Angeles* v. *Pomeroy*, 124 Cal. 597; 57 Pac. 585; *McClintock* v. *Hudson*, 141 Cal. 275; 74 Pac.

---

[1] For a full collection of the cases see 55 A. L. R. 1390.

849; *Los Angeles* v. *Hunter*, 156 Cal. 603; 105 Pac. 755.[2] Cf. *Ide* v. *United States*, 263 U. S. 497, 506. In saying this we do not intimate, either one way or the other, that our conclusion would be different if the geological formation were other than it is. To all this we add that once more as at other stages of the case complainant has been unsuccessful in supplying evidence of damage. As to that the Master finds: "There is no satisfactory proof that the use of the water from these wells materially lessens the quantity of water available for use within the State of Washington." If any wrong has been done, it is unsubstantial and uncertain.

What has been said avails without more to repel the claim of the complainant that by the dams at the Red Bridge or by the use of wells or pumps, the Oregon irrigators are wrongfully diverting or depleting the waters of the river to the prejudice of irrigators resident in Washington. To repel this claim of wrong, however, does not dispose of the whole case. The question remains whether the Oregon irrigators as a result of all their acts are taking to themselves more than their equitable proportion of the waters of the river, priority of appropriation being the basis of division. As to this too the Master has reported in their favor. For the understanding of his ruling and its satisfactory appraisal there is need to recur briefly to the claim of the Gardena Farms.

Washington does not challenge the priorities adjudged in the Oregon decree. Oregon does not challenge those adjudged in the Washington decree, except only the priority allotted to the Gardena Farms. If that priority is excluded, the Oregon irrigators have not exceeded their equitable quota, at all events in any measure so substan-

---

[2] Many cases are collected in Kinney, Irrigation and Water Rights, 2d ed., vol. 2, pp. 2162–2167; Wiel, Water Rights in the Western States, 3d ed., vol. 2, §§ 1042 *et seq.*

tial as to call for an injunction in a contest between states. A notice posted in 1892 fixed the locus of the intake of the canal for the Gardena project. This intake was far above the point where the branches of the Little Walla Walla unite with the main stream, if we except a few prongs of insignificant extent. The projectors of the canal were thus informed from the beginning that none of the waters of the Tum-a-lum above the Red Bridge would be available for the canal during the season of summer irrigation as long as the Oregon farmers were permitted to maintain the dams that diverted the waters of the Tum-a-lum into the Little Walla Walla. The physical conditions were notorious and were known to the canal company and, in particular, to its president, the leader of the enterprise. What was done or omitted in keeping the appropriation alive against the Oregon farmers in the vicinity of Milton must be read and interpreted in the light of that knowledge and its resulting obligations.

A priority once acquired or put in course of acquisition by the posting of a notice may be lost to the claimant by abandonment or laches. There must be no waste in arid lands of the "treasure" of a river. *New Jersey v. New York,* 283 U. S. 336, 342. The essence of the doctrine of prior appropriation is beneficial use, not a stale or barren claim. Only diligence and good faith will keep the privilege alive. *Seaweard v. Pacific Livestock Co.,* 49 Ore. 157, 161; 88 Pac. 963; *Re Rights of Waters of Silvies River,* 115 Ore. 27, 61; 237 Pac. 322; *Re Water Rights of Hood River,* 114 Ore. 112, 131; 22 Pac. 1065; *State ex rel. Ham v. Supreme Court,* 70 Wash. 442, 463; 126 Pac. 945.[3] When these are shown to be lacking, the water right will fail, or fail to the extent that equity re-

---

[3] See Kinney Irrigation and Water Rights, 2d ed., vol. 2, pp. 1978, 1988, 2004, and Wiel, Water Rights in the Western States, 3d ed., vol. I, §§ 371, 567 *et seq.,* collecting the decisions.

quires. Such according to the Master has been the fate of the Gardena filing. True a court in Washington determined in 1928 that the priority was to be recognized as of 1892. The decree was of no force against Oregon or Oregon appropriators not parties to the suit. *United States* v. *Oregon*, 295 U. S. 1, 12; *Priest* v. *Las Vegas*, 232 U. S. 604. As to them priority had lapsed, if the claimant had forfeited it by inequitable conduct. The label of the acts is unimportant, whether laches or estoppel or abandonment. What matters is their quality. Persistence in such conduct may extinguish the equitable right. It may bar an equitable remedy. Irrigators in another state, unaffected by the decree, are at liberty to show the facts, and upon the basis of that showing to fix their user of the stream.

Laches and abandonment, chargeable to the Gardena users, are found in the report. Not till 1930 was there a claim in their behalf to the beneficial use of the waters of the river arising above the bridge. Not till then was such a claim advanced by Washington itself or by any of its residents. Without a sign of challenge the Oregon users were allowed to develop their little settlement in the faith that their enjoyment of the waters was uncontested by any one. During these many years of growth Gardena Farms in particular evinced by many acts its recognition and acceptance of the existing situation. These acts are narrated carefully in the findings of the Master. There is no need to repeat them here. Viewing them collectively he concludes that the Gardena Farms District has never put the waters of the river arising above Red Bridge to a beneficial use during the irrigation season; that the intention to apply them to such a use was abandoned, if it ever existed, before the commencement of this suit; and that for a period of nearly forty years there has been recognition of the superior right of the Oregon appropriators. Here surely is not the diligence that equity

exacts of the suitor who invokes its distinctive jurisdiction.

We have dwelt upon the question of abandonment, for it has been much considered in the report and in the arguments of counsel. In so doing we have not meant to hold that in the absence of abandonment there would be an inequitable apportionment calling for relief by injunction, unless indeed the flow of the stream should unexpectedly increase. We are to bear in mind steadily that the controversy is between states, and not between private litigants, the burden and quantum of the proof being governed accordingly. *North Dakota* v. *Minnesota, supra.* At present there would be no benefit to Gardena, or none that has been proved, if the waters of the Tum-a-lum were not obstructed by the dam. In all likelihood they would be lost in the deep gravel of the channel and would not reappear beyond until the shortage season had gone by. So also, there would be no benefit, or none that has been proved, if the use of the Little Walla Walla were less than it has been. The chief points of junction with the main river are below the intake of the canal where Gardena is privileged to tap the waters of the stream. No evidence brought to our notice by either of the parties carries with it a suggestion that other Oregon priorities would be cut down or displaced if the Gardena priority were established to the full. We need not go into the question more fully at this time.

The case comes down to this: the court is asked upon uncertain evidence of prior right and still more uncertain evidence of damage to destroy possessory interests enjoyed without challenge for over half a century. In such circumstances an injunction would not issue if the contest were between private parties, at odds about a boundary. Still less will it issue here in a contest between states, a contest to be dealt with in the large and ample way that alone becomes the dignity of the litigants concerned.

530

A decree will be entered confirming the report of the Master, and dismissing the complaint upon the merits, the costs and expenses of the suit to be divided between the parties in accordance with the usual practice. *Michigan* v. *Wisconsin,* 270 U. S. 295, 319, 320; *North Dakota* v. *Minnesota,* 263 U. S. 583.

*It is so ordered.*