## SCHWAB v. BEAM et al.

### (Circuit Court, D. Colorado. March 30, 1898.)

1. WATERS AND WATER COURSES—ABANDONMENT OF WATER RIGHTS.

A placer location ex vi termini imports an appropriation of all waters covered by it, so far as such waters are necessary for working the claim, especially when the location covers both banks of the stream, and there can be no abandonment of the water as distinguished from the land or of the land as distinguished from the water.

2. SAME.

Where a patent issues for a mining claim, if the owner finds mining unprofitable, and holds the property for sale as a mill site, or a site for an electric power plant or some manufacturing establishment, he does not thereby lose the water right which he had as a miner.

3. SAME.

Article 16, § 6, Const. Colo., which provides that "the right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied," applies only to unappropriated waters, and not to a case where, by the location of a placer claim, the water has been appropriated.

4. SAME.

Nothing in the constitution of Colorado, or in the law relating to irrigation, modifies or changes the rule of common law that for manufacturing, mining, or mechanical purposes each riparian owner may use the waters of running streams on his own premises, allowing such waters to go down to subjacent owners in their natural channel.

Rogers, Cuthbert & Ellis, for complainant.
Patterson, Richardson & Hawkins, for defendants.

HALLETT, District Judge. Complainant is the owner of seven placer-mining claims on the north fork of the San Miguel river, in the county of San Miguel, called "Boston," "Keystone," "Keystone Extension," "Washington," "Colorado," "Pekin," and "San Miguel." All of the claims are traversed by the river, excepting the Keystone Extension, to which water from the river is conducted by means of a flume. The several claims were located prior to the year 1882, and patents were issued in that year to complainant's grantors. Some of the claims were worked as placers, and the waters of the river were used for that purpose prior to the year 1889. In that year the waters of the river were diverted near the east end of the Keystone placer for the purpose of hydraulic mining upon several of the claims, and work was carried on extensively in the years 1889 to 1892. From 1892 to 1897 but little was done in the way of mining, but there was always an agent in charge, and some effort was made to keep up the flume, and to use water therefrom at different times. The testimony as to what was done upon the property in those years is highly conflicting, and leads to the result that complainant and his grantors were in actual possession, and that work was not done with a view to profit or development. In the month of August, 1897, respondents located the Yukon placer in the valley of the San Miguel river, at a point somewhat south of the Pekin placer, owned by complainant. The south fork of the river unites with the north fork on the Pekin placer. The Yukon placer may touch the south fork of the river, but it does not extend to the united streams, or to the north fork, which traverses the Pekin placer from end to end. Afterwards, and in

the month of September following, respondents located a flume and water right on the north fork of the San Miguel river, about 1½ miles east of the Yukon location, and near the northeast corner of complainant's Boston claim. The head of the flume is on the Denver placer, which is probably owned by respondents. From thence the line of the flume is laid in a westerly direction on the mountain side, slightly above complainant's flume, and in the course of the San Miguel river, to a point about 1,150 feet east of the west end of the Pekin placer, and thence across the Pekin placer and the San Miguel river to the Yukon placer. In its course from east to west it traverses the Keystone and the Keystone Extension placers, belonging to complainant, for a distance of about 2,500 feet. In its southerly course across the Pekin placer its length is about 1,200 feet. Thus it appears that the proposed diversion of the waters of the San Miguel river which the complainant seeks to restrain is at the highest point on the course of the river to which complainant's property extends. From thence the water is to be carried outside of the channel of the river, and on the north side of the channel, over two of complainant's locations, and north of three or more of them and across one of them to a point on the Yukon placer south of the Pekin placer. Whether the water liberated at that point on the Yukon placer would be available for use on complainant's San Miguel placer, which is furthest west of his locations, was not stated at the bar, and may not be disclosed in the record. Sufficient appears to show that the effect of respondents' diversion would be to deprive complainant of water in the channel of the river on six of his locations during some part of the year. Respondents' appropriation is 20,000 miners' inches, which the testimony shows would be all the water in the channel of the river at certain seasons of the year, although at other times there is much more flowing in the channel. The purpose for which the water is to be used on the Yukon placer is for making electric power and lights, although it is said that some mining has been done by respondents in that locality. Many witnesses were examined to show the nature and extent of the diversion of the waters of the San Miguel river in the year 1889, and subsequently by complainant's grantors, and whether the use of the flume and ditch then constructed on the property was continued by complainant after the year 1892. Respondents' counsel declared in argument that the flume and ditch were abandoned after 1892 by complainant's grantors and himself, and that the waters of the river were subject to a new appropriation in August, 1897. The court is of the opinion that the matter of the diversion of the waters of the river by complainant's grantors in the year 1889 is not controlling; although, if it were necessary to determine the fact, the court would be inclined to find that the waters of the river were fully appropriated at that time, and that there is no satisfactory evidence of abandonment at any time afterwards. A placer location ex vi termini imports an appropriation of all waters covered by it, in so far as such waters are necessary for working the claim. This is true especially when the location covers both banks of the stream, because there is a reasonable presumption that the locator intends to work the channel and the banks, wherever he may find pay dirt. A placer

claim cannot be worked without water. Where water is scarce, a small stream may be made to suffice. Every one who is in any way familiar with the subject knows that the miner always prefers to have a copious supply. Where, as in this instance, the work is carried on by hydraulic force, the volume of water must be large. No doubt is entertained that the locators of the several claims now owned by complainant intended to appropriate the waters flowing in the channel of the river as well as the channel, the banks, and all territory embraced within the locations to the business of mining, and the title to the water is the same as the title to the land. There can be no abandonment of the water as distinguished from the land, nor of the land as distinguished from the water. Each is without value when separated from the other, and therefore they cannot be legally divorced. It is said, however, that complainant, having found the business of mining to be unprofitable, no longer intends to work his claims, and now holds them for sale as a mill site, or as a site for an electric power plant or some manufacturing establishment. Be it so; the government has issued patents for the claims, and the title of complainant is now absolute for any purpose to which they may be put. A patent for agricultural land does not limit the use of the patentee to tilling the soil which may be conveyed by the patent. No more is a patent for mineral land, whether lode or placer, restrictive of the use of the territory which may be conveyed. A placer claim has been used as a town site apparently with the approval of the supreme court of the United States. Smelting Co. v. Kemp, 104 U. S. 636. All other uses to which land may be put must be equally open to the grantee after title has passed from the government.

Respondents rely very much on section 6, art. 16, of the constitution of the state of Colorado, which declares: "The right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied." This language, it will be observed, is applicable to the unappropriated waters of a natural stream. If, as we assume, the location of complainant's placer claims on the San Miguel river was an appropriation of the waters of that river so far as it runs through the several claims, this section cannot control the question under consideration. The waters were appropriated when the claims were located, and the owner of the claims is entitled to have them ut currere solebat, without diminution, subject to the reasonable use of other riparian owners higher up on the course of the stream. No question arises under the last clause of section 6 of the constitution of the state, cited above, because complainant and respondents are each of the manufacturing class, within the meaning of that section. Counsel for respondents suggested in argument that electric lights were to be classed as a domestic use, but he was unable to say much in support of that construction. Clearly enough, the business of making electric lights and power is a sort of manufacture, and of the same class as mining, or other use of water power. Therefore the parties are upon an equal footing in respect to the use which they intend to make of the waters of the San Miguel river. In this connection it may be observed that washing gravel by hydrostatic press-

ure from the channel or bank of a river is not very far removed from running a stamp mill by water power, or running dynamos for making electricity. There is some difference in the machinery and appliances of the several kinds of work, but the power is the same. The use of the water of the San Miguel river, in 1889, for hydraulic mining, was an exercise of water power very similar to that which respondents now demand for operating a power plant. Both parties stand upon placer locations, and the doctrine of first appropriation seems to support complainant's locations, as they are many years older than respondents' locations, made in 1897.

Many authorities cited by counsel expound the law relating to the irrigation of agricultural lands in arid regions. An early advocate of the right to appropriate water for irrigating lands, as always understood and maintained in this state, the author of this opinion desires to recognize and enforce the principle on which it stands in every case to which it may be applicable. It is believed that the chief purpose of article 16 of the constitution of the state of Colorado is to maintain and establish the wise principle of appropriation and continual use, which was fully understood by the makers of that instrument. But nothing in the constitution of the state or in the law relating to irrigation in any way modifies or changes the rules of the common law in respect to the diversion of streams for manufacturing, mining, or mechanical purposes. In Colorado, as elsewhere in the United States, the law is now, as it has been at all times, that for such purposes each riparian owner may use the waters of running streams on his own premises, allowing such waters to go down to subjacent owners in their natural channel. The injunction will be allowed according to the prayer of the bill.