ALASKA JUNEAU GOLD MINING CO. v. EBNER GOLD MINING CO. et al.*

(Circuit Court of Appeals, Ninth Circuit. February 5, 1917.)

No. 2795.

1. WATERS AND WATER COURSES ⬦==33—DIVERSION—INJUNCTION—EVIDENCE.
   In a suit to restrain a mining company from interfering with the water right claimed by plaintiff, evidence *held* to show 'that the individual who posted in his own name the notice of diversion under which the company claimed was acting for it, and in pursuance of a plan for developing its property.
   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 23–26.]

2. WATERS AND WATER COURSES ⬦==16—DIVERSION—NOTICE—PLACE OF USE.
   A notice of diversion of water, posted at a point where the company for which it was posted was then diverting water for a small mill, which stated that the flume for the new diversion might be carried across the creek, was sufficient to show an intention not to use the water at the site of the old mill.
   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 8.]

3. WATERS AND WATER COURSES ⬦==16—DIVERSION—NOTICE—POINT OF DIVERSION.
   Plaintiff cannot object that defendant's notice of diversion of water, posted at a point above plaintiff's dam, failed to show that the water was to be taken out above the dam, where he admitted that it was the universal custom to post the notice at the point of intended diversion.
   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 8.]

4. CORPORATIONS ⬦==180—ACTS OF STOCKHOLDERS—MAJORITY STOCKHOLDER.
   The owner of nearly all the stock in a corporation sustains a fiduciary relation to it, and acts done with relation to its property at his instance are done on behalf of the corporation or for its benefit.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 665–673.]

5. WATERS AND WATER COURSES ⬦==23—DIVERSION—NOTICE—PLACE OF USE.
   Where a mining company, at the time of posting a notice of intention to divert water for use at another point on its group of claims, was in possession of land claimed by it as a mill site adjoining its mining claims, which subsequently was adjudged to be public land because of the existence of mineral thereon, and was relocated by the company as a lode claim, the water diverted in accordance with the notice can be used at the mill erected on that claim.
   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 15, 18.]

⬦==For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied May 14, 1917.

6. WATERS AND WATER COURSES ☞33—DIVERSION—NOTICE—PERSONS ENTI-
TLED TO BENEFIT.

The fact that an individual, who posted a notice of intention to divert
water for use on defendant's group of claims, conveyed his rights to an-
other, who was a stockholder and bondholder of a corporation, which
owned most of the stock in defendant corporation, and who advanced
money to defendant, which was hindered from getting money for develop-
ment because of litigation between it and plaintiff, is not inconsistent with
the finding that the notice was posted on behalf of defendant corporation.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§§ 23–26.]

7. APPEAL AND ERROR ☞1011(1)—REVIEW—FINDINGS OF FACT.

A finding of the District Court, that miner's rules relating to the di-
version of water were not in force when the rights of the parties origi-
nated, made upon conflicting evidence, cannot be disregarded by the Cir-
cuit Court of Appeals, even if contrary to the weight of evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–
3988.]

8. WATERS AND WATER COURSES ☞16—DIVERSION—NOTICE—TRESPASS.

A mining company, which posted notice of an intention to divert water
from a stream on land patented to another company without permission of
the latter, was a trespasser, and could base no right to the use of water
on the posting of such notice.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§ 8.]

9. WATERS AND WATER COURSES ☞17—DIVERSION—DILIGENCE—TEMPORARY
SUSPENSION OF WORK.

Evidence of a temporary suspension of the work of diverting water for
a mill after the posting of the notice, as a result of hostile acts by a
rival claimant, does not show want of due diligence in the prosecution of
the work.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§ 9.]

Appeal from the District Court of the United States for the First
Division of the District of Alaska; Robert W. Jennings, Judge.

Suit for injunction by the Alaska Juneau Gold Mining Company
against the Ebner Gold Mining Company and others. Decree for de-
fendants, and plaintiff appeals. Remanded, with instructions to cor-
rect the decree in accordance with findings of fact, and in other re-
spects affirmed.

The appellant brought a suit against the appellees to enjoin them from
interfering with the appellant's asserted right to the use of a portion of the
waters of Gold creek, near Juneau, Alaska. The trial resulted in a decree
dismissing the complaint, and adjudging that the appellee the Ebner Gold
Mining Company was entitled to the first and paramount use of the waters of
Gold creek, to the extent of 10,000 miners' inches. As the last-named company
is the real party in interest in the litigation, it will in this opinion be desig-
nated the appellee. The court below, upon the testimony, found in sub-
stance the following facts:

(2) That the appellee was for a long time prior to the commencement of
the suit the owner of a number of contiguous quartz mining claims and
mill sites in Silver Bow basin, near Juneau. That the claims contained a
low-grade milling ore, bearing gold of great value. That at the upper end
of the group the lode claims are high up on the mountain side, and that the
mill sites are in the valley below. That there flows over and across the
group Gold creek, a mountain stream carrying at certain seasons a large

volume of water, and at other seasons much less by reason of cold weather. That for 15 or 20 years prior to the suit the appellee had been mining and milling the ores taken from the upper end of the group·by means of a 10-stamp quartz mill, and later by a 15-stamp quartz mill, located near the upper end of the group. That for the purpose of power in such milling of the ore the appellee had diverted and appropriated and used from Gold creek all the water that was necessary—the water being diverted near the upper end of the group of claims, and after use being returned to the creek.

(3) That some time in the year 1908 the appellee and Ebner, its general manager, concluded to mine and mill the appellee's ores on a more extensive scale, and for that purpose to drive a large working tunnel, commencing the same at the lower end of the group, upon what is known·as Cape Horn No. 2 lode claim, and driving the same through said group of claims to the upper end thereof, and to erect and equip a stamp mill of 150 or 200 stamps at or near the lower end of said tunnel, and to build and construct a flume and pipe line to take water from Gold creek, at or near the point where the water had been theretofore diverted by the appellee, to a point near the lower end of said tunnel, at which point the stamp mill and other buildings were to be erected. That during the year 1909 one H. T. Tripp, an experienced mining engineer, was employed by persons interested in the appellee's group of mining claims to examine and explore the mining property, and report on the advisability of mining the same on a larger scale, as had been decided by Ebner and the appellee. That Tripp made such examination and reported favorably on the proposition, about the last of June or 1st of July, 1910.

(4) That as early as October, 1880, the miners in and near the vicinity of Juneau and Silver Bow basin diverted and appropriated water from streams, to be used for mining and other beneficial purposes, and ever since that date it has been the universal practice and custom to post a notice in writing in a conspicuous place at the intended point of diversion of the stream, and its waters expected to be diverted, and that the posting of such notice has always been considered the first step toward the appropriation and application of the water to mining or other beneficial use, and as giving warning and notice to others of the appropriators' intention. That the posting of such notice does serve the purpose so stated. That Tripp knew of that custom, and on June 29, 1910, he attached to a board and posted in a conspicuous place on the appellee's dam, which had been used by it for diverting water in its mining operations, a written notice claiming 10,000 miner's inches of water out of the said Gold creek, the notice being as follows: "Notice is hereby given to all whom it may concern that I, the undersigned, claim 10,000 miner's inches of water flowing in·this creek, or any part of 10,000 miner's inches that may be flowing at any season of the year, to be conveyed by ditch, flume, or pipe along the bank of Gold creek, with pipe or flume or both to any place on the property known as the Ebner mine, or to carry across or farther than the limits of the said mine property. This location is made on the ground this day and date, and is posted at the place known as the Ebner dam, about 1¾ miles up from Juneau, Alaska, on Gold creek. Dated this 20th day of June, 1910." That said notice could be plainly seen from a public highway which runs up Gold creek near the dam on which the·notice was posted. That while Tripp signed his own name to the notice, he was acting on behalf of and for the appellee's group of mines, and the parties interested therein, and the said water was intended to be conducted from the point of intake to the appellee's mill site at the lower end of the appellee's property, and to be used in the new mill which was to be built for mining purposes. That the posting of Tripp's notice was the first step taken by any one toward future diversion and appropriation of the waters of Gold creek, and was prior to any step taken by the appellant, or any intention made manifest by the appellant, of taking water from Gold creek. That not until after the appellee had followed up the posting of the notice by actual physical work at the point where the notice was posted, and after actual diversion of the water at that point, did the appellant do anything to give notice to the appellee of any claim that the appellant intended to make to the water of Gold creek, or to appropriate any portion thereof.

(5) That Tripp, long before the commencement of the suit, transferred to the appellee whatever right or title he acquired by posting the notice. That work was commenced under that notice, and has proceeded with due diligence. That soon after the filing of the notice work was commenced on the tunnel, and at the time of the commencement of the suit the tunnel had been driven 2,600 feet. That a right of way was surveyed out for a high line flume, commencing at the point where the Tripp location notice was posted, and running to a point near the lower end of the tunnel and the mill site, and a flume 3¾ feet by 4 feet, and about 4,000 feet long, with a carrying capacity of 3,200 miner's inches of water had been completed at the time of the commencement of the suit. That on September 14, 1910, water was diverted from Gold creek at the point where the Tripp notice was posted, and was running through a large open cut made for the purpose of laying the new flume, and this diversion was prior to any diversion made by the appellant. And the court found, in general, that the work of driving the tunnel, of laying the flume, and of constructing the mill were all diligently and actively continued.

(6) That, at the time when the appellant claims that the appellee was wrongfully depriving the appellant of the use of the water, the appellee was using the same, and it was necessary at all times for the appellee to have the same in the progress of its work.

(7) That the tunnel is being driven through the group of mining claims known as the Ebner mine, and for the benefit of which the water was located by Tripp. That all work in connection with the development and opening of the ore bodies in said mining claims since the location of the water by Tripp has been done with diligence, and that $351,000 have been expended therein, and that all this was done for the purpose of opening up the Ebner group of mining claims as a mine, so that the bodies of ore therein could be mined and milled.

(8) That the miner's rules and regulations which the appellant set out in its reply were never followed by the miners, and were never put in force, or, if they ever were followed, or put in force, thy fell into disuse and became obsolete before the rights of either of the parties to this suit were claimed to be initiated. That they are inconsistent with the general laws of the United States, and could not be enforced after the extension of organized government to Alaska in the year 1884. That the work of diversion, appropriation, and application of the water by the appellee was prosecuted to completion with reasonable diligence from the time of the inception of the right.

The court found as a conclusion of law that, as against the appellant, the appellee is the owner of, and entitled to the first use of, 10,000 miner's inches of water to be taken from Gold creek, at or in the vicinity of the place where the Tripp notice was posted, and that the rights of the appellant are subordinate thereto.

J. A. Hellenthal, of Juneau, Alaska, and Curtis H. Lindley, of San Francisco, Cal., for appellant.

John R. Winn, of Juneau, Alaska, and Alfred Sutro, of San Francisco, Cal. (Winn & Burton, of Juneau, Alaska, and Pillsbury, Madison & Sutro and A. D. Plaw, all of San Francisco, Cal., of counsel), for appellee Ebner Gold Mining Co.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above).    [1] The appellant, adverting to the fact that Tripp was employed by one Underwood and by the California-Nevada Copper Company, and not by the appellee, contends that the evidence shows that Underwood employed Tripp to investigate the property, so that, if Underwood should afterwards acquire rights thereunder, he might, if he saw fit, adopt the plans; that, whatever Tripp's intentions were, they were entirely

personal and speculative, and never were adopted by the appellee, or by any one by any overt act until after August 1, 1910, the date when the appellant began its operations; that on leaving the employment of Underwood Tripp never advised the parties who succeeded Underwood of what he had done, but he retained in his possession the only copy of the notice he had posted, and that Tripp never had any intention of taking the water out on the north side of the creek, but that his intention was to preserve the old flume and utilize it in the later operations.

The evidence is that, at the time when Tripp posted the notice, he was, and for some time had been, in the employment of Underwood, who at that time was, by purchase from Ebner, the owner of nearly all of the capital stock of the appellee. On October 19, 1909, Underwood wrote to Tripp, telling him to find the best mill site for the Ebner property "as things now stand," and, referring to the 200-stamp mill which was to be built the next year, when the spot for the mill should be settled, and telling him that, when that spot was settled, he could plan his tunnel, etc. Tripp testified that he had dealings with the directors of the Copper Company, with which Underwood was connected, and which company succeeded to all of Underwood's interests, and the evidence shows that Tripp, on his arrival on the ground, asked Ebner for the keys to the boarding house and the property, told him he was ready to commence operations, and it shows that Tripp put up an assay office and started the boarding house, and that he was in full control and possession of all the property of the appellee, so long as he remained on the premises. On September 25, 1909, he wrote to Ebner, referring to the fact that in company with Ebner he had selected a location "which we have jointly agreed upon as being the proper location for a tunnel to the Ebner mines." Tripp's plan at that time contemplated that a 200-stamp mill should be built on the Cape Horn No. 2 lode claim, that a tunnel should be commenced at that point and carried to the upper end of the group of claims, and that water should be carried from the old dam to the new mill site, following the south bank of the creek for a distance, then to cross to the north bank thereof, and thence to the new mill site. In July, 1910, Tripp turned over his work to Bent, his successor.

[2] There can be no question that Tripp, in posting the notice, was acting for and on behalf of the appellee's group of mines, and in pursuance of a definite plan, and we think the court below properly held that the notice was sufficient to indicate an intention to appropriate the water for the purposes thereafter claimed by the appellee. The notice specified that the flume might be carried on the southerly side, "or to cross the creek with pipe or flume, or both, to any place on the property known as the Ebner mine." There was sufficient in this to show that it was not the intention to use the water at the site of the old stamp mill. If such had been the intention, there was no occasion to post a notice. The water was already being conducted to, and in use at, that mill.

[3] To the contention that the notice did not indicate an intention to take the water out at any point above the appellant's dam, it is a

sufficient answer to point to the admission, in the appellant's reply, that "it has been and is the universal and general rule, practice, and custom for those desiring to appropriate water to post a notice in writing in a conspicuous place at the point of intended diversion."

[4] Acts done by Tripp at the instance of Underwood, or at the instance of the Copper Company, must be deemed to be done for the benefit of the appellee's group of mines, and to inure to the advantage thereof. Underwood, and later the Copper Company, by virtue of owning all, or nearly all, of the stock of the appellee, represented the appellee in these transactions, and sustained a fiduciary relation to it. In Wheeler v. Abilene Nat. Bank Bldg. Co., 159 Fed. 391, 393, 89 C. C. A. 477, 479 (16 L. R. A. [N. S.] 892, 14 Ann. Cas. 917), it was said:

"The holder of the majority of the stock of a corporation has the power, by the election of biddable directors and by the vote of his stock, to do everything that the corporation can do. His power to control and direct the action of the corporation places him in its shoes, and constitutes him the actual, if not the technical, trustee for the holders of the minority of the stock. He draws to himself and uses all the powers of the corporation."

See, also, Jones v. Missouri-Edison Electric Co., 144 Fed. 765, 75 C. C. A. 631; Union Pacific R. Co. v. Frank, 226 Fed. 906, 920, 141 C. C. A. 510.

[5] But it is argued that there was nothing in Tripp's notice to show that the water was intended to be used at any point outside of the Ebner group of mines, and it is said that that group ended on the south with the Lotta claim, and that between the Lotta claim and the new mill site intervened a tract of land now known as Parish lode No. 2, but which at the time of the posting of the notice was public land of the United States. But the evidence shows that the ground covered by the Parish lode No. 2, although in subsequent litigation between the parties to this cause it was held to be public land, was at the time of the Tripp notice in the actual possession of the appellee, which had theretofore taken steps to locate the same. At that time, and for more than a year prior thereto, the appellee's mining property consisted of the Golden Fleece, Crown Point, Keystone, Taku, Lotta, Parish No. 1, the Cape Horn, and the Eureka mill site south of the Cape Horn, which subsequently, on account of quartz discovery therein, was located as the Cape Horn No. 2 lode claim. Although Ebner held the title to Cape Horn and Cape Horn No. 2, he held it in trust for the appellee, or the owners of its capital stock. This is shown by his letter to Tripp of September 25, 1909, in which he suggests that the assessment work for those claims be performed by work in starting the tunnel.

[6] The appellant points to the fact that on April 4, 1912, Tripp sold his water rights under his location notice to Hoops, who on March 10, 1913, sold the same to Jennings, and that it was not until May 21, 1914, that Jennings conveyed to the appellee. But this evidence, we think, is not inconsistent with the other testimony showing Tripp's relation to the appellee through Underwood and the Copper Company. Hoops was not a stranger to the appellee. He was a stockholder and

bondholder of the Copper Company, and he had advanced money for the Ebner mines to keep the work going on; the appellee being at that time hindered by litigation with the appellant, and on that account unable to raise all the necessary money.

[7] The finding of the court below that the rules and regulations which were pleaded in the appellant's reply were not in force at the time when the rights of either of the parties to the present suit were initiated was made upon conflicting evidence, and we would not be at liberty to disregard it, if we were of the opinion that it was contrary to the weight of the evidence. A consideration of the evidence, however, convinces us that the finding is well sustained.

[8] We discover no ground to disturb the finding of the trial court that not until after the appellee had followed up the posting of the Tripp notice by actual physical work at the point where the notice was posted, and after actual diversion of water at that point, did the appellant do anything that would give notice to the appellee that the appellant intended to make any claim to the water of the creek, or to appropriate the same. The appellant having brought the suit, and having therein attacked the right of the appellee, the burden was upon it to show that it had acquired a prior right to divert water from the creek at the point where it had constructed the Alaska Juneau dam. The appellant had initiated its claim by posting a notice on August 1, 1910, in which claim was made to 20,000 miner's inches of the water of Gold creek, to be used for milling, mining, and other purposes, "said water to be diverted from said creek at a point indicated by this notice posted on a tree, and about one mile from the mouth of the said Gold creek. Said water is to be diverted by ditch, pipe, and flume." The evidence is without dispute that the notice was posted on the Lotta claim, a claim which had been patented to the appellee. The evidence further shows that it was not posted there by reason of any mistake as to the boundaries of the Lotta claim, but that it was deliberately and intentionally placed there under a claim of right and title to the land, by virtue of a mining claim located on July 20, 1910, designated the Oregon lode mining claim, which overlapped the Lotta claim.

The appellant's projected ditch or flume was to extend over a portion of the Lotta claim, and over the Parish No. 2 claim, lying south thereof. In an action of ejectment, brought by the appellee against the appellant, it was finally adjudged that the appellant's attempted location of the Oregon claim was void, and that the appellee was the owner of the whole of the Lotta claim. Ebner Gold Mining Co. v. Alaska-Juneau Gold Mining Co., 210 Fed. 599, 127 C. C. A. 235. On October 3, 1910, and before that action was commenced, the appellant began to build a dam on the Lotta claim at the point where its notice was posted. The dam site was subsequently abandoned, and the appellant built its dam at the line between the Lotta claim and the Parish No. 2. The acts so done upon the appellee's property were acts of trespass, never assented to by the appellee, but actively opposed by it, and they could not become the basis of a right to appropriate the water of Gold creek. "The right of appropriation extends only

to waters upon the public domain of the United States, or upon the public lands of a state, for one cannot acquire a water right on land held in private ownership by another without acquiring an easement in such land." 40 Cyc. 704; Prentice v. McKay, 38 Mont. 114, 98 Pac. 1081; Smith v. Denniff, 24 Mont. 20, 60 Pac. 398, 81 Am. St. Rep. 408; Marshall v. Niagara Springs Orchard Co., 22 Idaho, 144, 125 Pac. 208; Tobey v. Bridgewood, 22 Idaho, 566, 127 Pac. 178.

[9] Nor do we find ground for disturbing the finding of the court below that the appellee's project was prosecuted with due diligence from and after the date of the posting of the Tripp notice. It is true that there is evidence of a temporary suspension of activity, but the testimony leaves no doubt that this was the direct result of a series of hostile acts on the part of the appellant.

The point is made that the decree is erroneous, in that it awards the appellee the first use of 10,000 inches of water, whereas the court found as a fact that the capacity of the appellee's flume is but 3,200 inches. The attention of the court below was not directed to this error by a motion to correct the same, or by the assignments of error.

The cause will be remanded to the court below, with instructions so to correct the decree as to accord with the finding of fact as above indicated. In other respects the decree is affirmed, and the appellee is awarded costs on the appeal.