# WHITMORE v. SALT LAKE CITY et al.

No. 5607. · Decided May 15, 1936.   (57 P. [2d] 726.)

Rehearing Denied October 14, 1936.

*T. D. Lewis* and *Lynn S. Richards,* both of Salt Lake City, for appellant.

*Fabian & Clendenin* and *Fisher Harris,* City Atty., all of Salt Lake City, *Joseph Chez, Atty. Gen.,* and *Glen E. Howe,* City Atty., of Murray, for respondents.

ELIAS HANSEN, Chief Justice.

This appeal involves a review of a judgment declaring valid a filing for power purposes on a flow of 15 cubic feet per second of the water of Little Cottonwood creek in Salt Lake county, Utah. The controversy began before the state engineer of the state of Utah, before whom plaintiff herein objected to the approval of an application of one Leland H. Kimball to appropriate the water in question. After a hearing was had before the state engineer, the application was approved. Mr. Whitmore, plaintiff herein, appealed from

the decision of the state engineer to the district court of Salt Lake county, Utah. At the time of the hearing before the district court, the defendant Murray City held title to the water filing in controversy. Mr. Kimball transferred all of his interest in the filing to Salt Lake City and it in turn transferred its interest therein to Murray City.

Plaintiff attacks the judgment appealed from on the following grounds: That an appropriation of water of a natural stream may not be made where the proposed point of diversion from the stream is upon private property of another. That plaintiff has such an interest in the water in controversy as to preclude others from the appropriation thereof. That the information necessary to make the application for the appropriation was obtained by a trespass and, therefore, the application and all proceedings had thereunder are void. That the application, in any event, is void because actual construction work was not commenced within six months after its approval. That if any actual construction work was performed within six months after the approval of the application, such construction work constituted a trespass upon private property was sham and frivolous and not done in good faith, and hence must be disregarded.

A proper understanding of the questions of law presented for review requires a brief summary of the evidence offered and received at the trial. Little Cottonwood creek has its source in the Wasatch mountains. It flows in a westerly direction into Salt Lake Valley. The point designated as the proposed point of diversion in the application here brought in question is near the mouth of Little Cottonwood Canyon, down which the creek of the same name flows. At the time the application was filed, plaintiff was operating an oxygen plant about 150 feet above the proposed point of diversion. The oxygen plant was operated with hydraulic power generated by water diverted from Little Cottonwood creek some distance above the plant. Apparently, plaintiff is the owner of the right to use the water power which is so used to operate the oxygen plant. About three-

quarters of a mile west and down the creek from the oxygen plant, Murray City had, prior to the commencement of this controversy, diverted water from Little Cottonwood creek to operate a hydro-electric plant owned and operated by it for the generation of electricity for the use of the city and its inhabitants. Prior to making the filing here brought in question, Mr. Kimball conceived the idea that if Murray City could be induced to move its power plant upstream and divert water with which to operate the same at or near the tailrace of plaintiff's oxygen plant, then and in such case the water necessary to operate the Murray City plant could be used for that purpose and returned to Little Cottonwood creek at such an elevation as to run by gravity to Salt Lake City and there be used as culinary water. The filing here involved was made with that end in view. After the application was approved and Kimball assigned his interest therein to Salt Lake City, which in turn transferred it to Murray City, the plant of Murray City was moved upstream. Proceedings were commenced to condemn lands for the construction of diversion works at or near the point designated as the proposed point of diversion in the Kimball application. In the condemnation proceedings an order of occupancy was granted and at the time of the trial of this cause the diversion works of Murray City had been constructed. No claim is made, however, that plaintiff is estopped from asserting any rights that he may have had in and to the use of the waters claimed by Murray City under the Kimball filing because of the condemnation proceedings or otherwise. Nor does plaintiff contend that Murray City may not condemn lands for the purpose of constructing thereon works necessary for the diversion of waters of Little Cottonwood creek. He does contend that Murray City should be required to pay to him in the condemnation proceedings the value of the lands sought, not as mere land, but as land fitted by nature for a power site, and that a substantial part of the value of the power site so being condemned is plaintiff's and not Murray City's right to divert the water of Little Cottonwood creek at the point in question.

The application involved in this litigation was filed in the office of the state engineer of Utah on September 26, 1928. It was approved by the state engineer on May 18, 1929. The applicant was notified that he was required to begin actual construction work within six months after the date of the approval of his application and that he must diligently prosecute such work to completion. Leland H. Kimball testified that he is a civil engineer and has been such for sixteen years; that he has had considerable experience in making filings upon water for himself and others; that he has been intimately acquainted with Little Cottonwood creek since 1913; that he has been along the creek hundreds of times; that he had made numerous observations of the creek with the idea of securing a culinary supply of water for Salt Lake City; that before making the filing on the waters of Little Cottonwood creek he did surveying and drew complete plans and specifications for the removal of the Murray City plant; that such work was of the value of between $1,500 and $2,000; that he used a map of the Denver & Rio Grande Railroad Company to ascertain the point mentioned in his application for diverting the water from Little Cottonwood creek; that such point is in error and is in the public road about 85 feet to the north of the creek; that on or about July 26, 1928, he went to the place mentioned in his application as the proposed point of diversion; that he took with him one John I. Edwards whom he had employed to do some work at that place; that Mr. Edwards dug a number of test pits and a trench and cut some trees and brush at that place; that he paid Mr. Edwards $16 for four days' work. A canceled check in the sum of $16, claimed to have been given to Edwards in payment for the work, was received in evidence. Mr. Kimball further testified that the digging of the test pits and the trench did not reveal anything as to the nature of the ground near the diversion point that was not expected. The testimony of Mr. Kimball touching the nature of the work done at the proposed point of diversion, the number of days required

to do the same, and the payment made for the work is corroborated by the testimony of Mr. Edwards.

Plaintiff testified that he was, during the year 1929, manager of the oxygen plant located about 150 feet up the stream from the point where Murray City has recently installed construction works for the diversion of water from Little Cottonwood creek into its pipe line; that between September 26, 1928, and July 8, 1931, he was frequently at the oxygen plant and along the banks of Little Cottonwood Creek at and near the place designated in the Kimball application as the proposed point of diversion; that after Kimball filed his application, plaintiff made frequent observations to see if any work was being or had been done at the proposed point of diversion, and from such observation was certain that no work was done; that no test pits, trenches, or other work was done at that point during 1929 or at all until Murray City in 1931 began the construction of its diversion works.

Richard Whitmore testified that he is a son of the plaintiff; that during the summer of 1929 he was working at his father's oxygen plant and was conducting some experiments near and to the west of the oxygen plant; that he worked from about 8 o'clock in the morning until between 4 and 6 o'clock in the afternoon; that from the place where he worked he had a clear view of both banks of Little Cottonwood creek at and near the point of diversion mentioned in Kimball's application; that he did not see Mr. Edwards at that point; that he inspected the ground at and near the place where it was claimed Mr. Edwards dug a trench and some test pits; that there was no evidence of any work having been done at that point prior to 1931 when Murray City began the construction of its diversion works.

Sam Steward testified that he was employed by plaintiff and worked in his oxygen plant in the summer of 1929; that frequently after work he went fishing along Little Cottonwood creek at and near the place where it is claimed Mr. Edwards dug a trench and some test holes in July, 1929; that

there was no indication whatsoever that any such work was done.

Plaintiff entered into a contract with the Utah Granite & Marble Company, a corporation, on September 30, 1930, whereby the former agreed to purchase from the latter a tract of land in the mouth of Little Cottonwood Canyon. Murray City seeks to condemn for its diversion works and pipe line for its hydro-electric power plant some of the land covered by that contract. Upon execution of the contract, plaintiff went into the possession of the land covered thereby. The payments of the installments provided for in the contract were kept up. Plaintiff was in possession of the land so purchased at the time of the trial. The land so purchased slopes toward the west to such an extent that 175 horsepower may be developed thereon with the normal flow of Little Cottonwood creek. The Denver & Rio Grande Railroad Company owns a right of way for a railroad over the land purchased by plaintiff. At the point in question the railroad right of way extends along and to the north of Little Cottonwood creek. A public highway extends up the canyon to the north of the railroad right of way.

The foregoing brief summary of the facts and evidence disclosed by this record, while omitting many details, is deemed sufficient to understand the questions presented for determination on this appeal. It is earnestly urged on behalf of plaintiff that the water of a natural stream in this state may not be lawfully filed upon where the proposed point of diversion is upon privately owned land, unless the applicant has, at the time of making his filing, a lawful right to go upon the land at the point where the water is to be diverted. In support of such contention, the following cases and texts are cited: 40 Cyc. 701-703; 67 C. J. 960, 973; Wiel on Water Rights (3d Ed.) vol. 1, § 221, p. 224; 2 Kinney on Irrigation and Water Rights (2d Ed.) § 628; *Schwab* v. *Beam* (C. C.) 86 F. 41, 43; *Alaska Juneau Gold Min. Co.* v. *Ebner Gold Min. Co.* (C. C. A.) 239 F. 638; *Prentice* v. *McKay,* 38 Mont. 114, 98 P. 1081; *Smith* v.

*Denniff* (*on rehearing*) 24 Mont. 20, 60 P. 398, 50 L. R. A. 737, 81 Am. St. Rep. 408; *Scott* v. *Jardine Gold Min. & Mill. Co.*, 79 Mont. 485, 257 P. 406; *Warren* v. *Senecal*, 71 Mont. 210, 228 P. 71; *Alta Land & Water Co.* v. *Hancock*, 85 Cal. 219, 24 P. 645, 20 Am. St. Rep. 217; *Mettler* v. *Ames Realty Co.*, 61 Mont. 152, 201 P. 702; *Marshall* v. *Niagara Springs Orchard Co.*, 22 Idaho 144, 125 P. 208; *Stalling* v. *Ferrin*, 7 Utah 477, 27 P. 686; *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687.

The doctrine announced in the foregoing citations from Cyc., Corpus Juris, Kinney on Irrigation and Water Rights, and Wiel on Water Rights is to the effect that the government of the United States, first impliedly and later by direct legislation, authorized persons to go upon the public domain and there divert water and put the same to a beneficial use; that the states, especially in the arid region, have recognized a similar doctrine with respect to state owned land; that neither the United States nor any of the states have authorized or may lawfully authorize one to go upon the lands of another without his consent and there appropriate water to the damage of and without just compensation to the landowner. We readily approve that doctrine.

The case of *Schwab* v. *Beam*, supra, was a controversy between the parties to that action as to which had the superior right to the use of certain water for placer mining. In the course of the opinion, it is said:

"There can be no abandonment of the water as distinguished from the land, nor of the land as distinguished from the water. Each is without value when separated from the other, and therefore they cannot be legally divorced."

Further on in the opinion, it is said:

"But nothing in the constitution of the state or in the law relating to irrigation in any way modifies or changes the rules of the common law in respect to the diversion of streams for manufacturing, mining, or mechanical purposes. In Colorado, as elsewhere in the

United States, the law is now, as it has been at all times, that for such purposes each riparian owner may use the waters of running streams on his own premises, allowing such waters to go down to subjacent owners in their natural channel."

As will presently appear, our constitutional and statutory provisions affecting the public waters of this state are not susceptible of the construction placed upon the Constitution and statutes of Colorado by the learned judge who wrote the opinion in the Schwab Case. The case of *Alaska Juneau Gold Min. Co.* v. *Ebner Gold Min. Co.*, supra, is authority for the doctrine that one who trespasses upon the lands of another in an attempt to initiate a water right may not assert a claim to the water so attempted to be acquired against the owner of the land upon which the trespass is so committed. The cited cases from Montana and Idaho are to the same effect.

The cases of *Prentice* v. *McKay* and *Marshall* v. *Niagara Springs Orchard Company*, supra, go further. It is held in those cases that the defense that a water right is attempted to be initiated by trespass is available to one who is successor in title to the person who owned the land at the time the trespass was committed. In the case of *Mettler* v. *Ames Realty Company*, supra, it is said that an appropriation is not confined to waters flowing in streams upon public lands, but may be made from a stream flowing through privately owned land by invoking, if necessary, the aid of eminent domain proceedings. Similar views are expressed in the case of *Marshall* v. *Niagara Springs Orchard Company*, supra. The case of *Alta Land & Water Co.* v. *Hancock*, supra, is of but little aid in the solution of the questions presented in the instant case. That case recognizes some rights in a riparian owner, but no attempt is there made to define such rights. In California, as elsewhere in the arid region, the common-law doctrine of riparian rights has been modified from time to time to suit natural conditions. We shall not, in this opinion, attempt to point out what, if any, riparian rights continue to be recognized in California.

The two cases cited by appellant from this jurisdiction do not shed any appreciable light on the questions here presented for determination. In the case of *Stalling* v. *Ferrin*, supra, it was held that one who had not used an irrigation ditch, constructed across the public domain, since 1880, which ditch was filled up in 1883, was guilty of trespass when in 1890 he entered upon the land of the grantee of the government to reconstruct the ditch which had theretofore been abandoned. In the case of *Willow Creek Irrigation Co.* v. *Michaelson*, supra, it was held that the water of a spring which appeared on land after the same became privately owned was not subject to appropriation.

As early as 1880 the Legislature of the Territory of Utah recognized the doctrine of appropriation,

"For domestic purposes, irrigating lands, propelling machinery, washing and sluicing ores, and other like purposes * * * to the extent of, and reasonable necessity for such use thereof, under any of the following circumstances: First—Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, or other natural source of supply. Second—Whenever any person or persons shall have had the open, peaceable, uninterrupted and continuous use of water for a period of seven years."

"A continuous neglect to keep in repair any means of diverting, or conveying, water, or a continuous failure to use any right to water, for a period of seven years, at any time after the passage of this Act, shall be held to be an abandonment and forfeiture of such right." Laws of Utah 1880, c. XX, §§ 6 and 9, pp. 37, 38.

Since the act of 1880, there have been amendments touching the manner of acquiring the right to the use of public waters and the regulation of water generally, but the law has always been and continues to be that,

"the water of all streams and other sources in this state, whether flowing above or under the ground in known or defined natural channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."

"The use of water for beneficial purposes, * * * is hereby declared to be a public use." R. S. Utah 1933, 100-1-1, 100-1-3, 100-1-5.

Under our present law,

"when an appropriator or his successor in interest abandons or ceases to use water for a period of five years the right ceases, and thereupon such water reverts to the public, and may be again appropriated."

R. S. Utah 1933, 100-1-4.

"Any person shall have a right of way across and upon public, private and corporate lands, or other rights of way, for the construction, maintenance, repair and use of all necessary reservoirs, dams, water gates, canals, ditches, flumes, tunnels or other means of securing, storing and conveying water for domestic, culinary and irrigation purposes or for any necessary public use, or for drainage, upon payment of just compensation therefor, but such right of way shall in all cases be exercised in a manner not unnecessarily to impair the practical use of any other right of way, highway or public or private road, or to injure any public or private property." R. S. Utah 1933, 100-1-6.

"Whenever any applicant for the use of water from any stream or water source must necessarily enter upon private property in order to make a survey to secure the required information for making a water filing and is refused by the owner or possessor of such property such right of entry, he may petition the district court for an order granting such right, and after notice and hearing, such court may grant such permission, on security being given to pay all damage caused thereby to the owner of such property. In such case the priority of such application shall date from the filing of such petition with the district court as aforesaid." R. S. Utah 1933, 100-3-19.

The provisions of the section last quoted were enacted by the Legislature in 1919. See Laws Utah 1919, c. 67, § 43, p. 190. Such provisions have continued to be a part of the law of this state since enactment, and therefore were in effect at the time Kimball made the application which forms the basis of this litigation. Our State Constitution contains this provision:

"All existing rights to the use of any of the waters in this State for any useful or beneficial purpose, are hereby recognized and confirmed." Const. art. 17, § 1.

It is clear from the law thus quoted at some length that water flowing in natural streams in this state may be ap-

propriated for power purposes, notwithstanding the point of diversion is upon privately owned land. If the water flowing in a natural stream is, as the statute declares, the property of the public, subject to existing rights, and beneficial use is the measure and limit of the right to the use thereof, it is difficult to perceive how a landowner may successfully assert a right to water merely because it is flowing in a natural channel which passes over his land. Under the common law an appropriator whose lands border upon a natural stream or through whose land it flows had certain rights in and to the water flowing in such stream. The doctrine of riparian rights is, in the main, at war with the law of appropriation. The common-law rights attached to riparian lands as a part thereof, while beneficial use is the foundation of the law of appropriation. Prior to the admission of Utah into the Union, this court held that:

"In this Territory the doctrine of riparian rights has never been recognized, and a statute of the Territorial legislature ignoring the right of a riparian proprietor at common law to have the water in a stream flow in quantity and quality as it was wont to do when he acquired title, is valid."

The quotation is from the syllabus and reflects the doctrine announced in the case of *Stowell* v. *Johnson*, 7 Utah 215, 26 P. 290. Such has been the uniform holding of this court. Among the numerous cases in this jurisdiction so holding are: *Nash* v. *Clark*, 27 Utah 158, 75 P. 371, 1 L. R. A. (N. S.) 208, 101 Am. St. Rep. 953, 1 Ann. Cas. 300; the same case on appeal to the Supreme Court of the United States; *Clark* v. *Nash*, 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; *United States* v. *Caldwell,*. 64 Utah 490, 231 P. 434; *Oldroyd* v. *McCrea*, 65 Utah 142, 235 P. 580, 40 A. L. R. 230; *State* v. *Rolio*, 71 Utah 91, 262 P. 987.

Appellant recognizes that the common-law doctrine of riparian rights has been, in the main, repudiated in this state, but as we understand him he contends that the doc-

trine still prevails while the water of Little Cotton-
wood creek is flowing across his land. To so hold,
may in many cases render impotent the law of ap-
propriation. It is easy to conceive of a state of facts where
public water is available to public use, but there is no place
except upon private land where it may be diverted from the
natural stream or other source of supply. To hold that a
riparian owner may prevent the appropriation of public
water under such a state of facts is to disregard the spirit
and, as we think, the letter of the law of appropriation. It
was probably to meet some such state of facts as are involved
in this case that the Legislature in 1919 provided that any
applicant may, when necessary, "enter upon private prop-
erty in order to make a survey to secure the required infor-
mation for making a water filing and * * * may petition
the district court for an order granting such right," and
that "in such case the priority of such application shall date
from the filing of such petition with the district court." If
a landowner is compensated for damage done to his land, he
is in no worse position if the water is diverted at a point on
his land than he would be in if it were diverted before it
reached his land. If it is diverted before it reached his land,
there is no legal reason why a right of way may not be con-
demned across the riparian owner's property to the proposed
point of diversion on his land and thence to the place of use.
To say that water may not, in the first instance, be diverted
on the land of a riparian owner, but it may be diverted above
and coursed across his land and possibly through a desired
point of diversion on his land, is not tenable.

Appellant further contends that the water here in ques-
tion could not be diverted above his land because he has a
right in the water of Little Cottonwood creek for power to
operate his oxygen plant. While there is no evidence
in this record as to the nature and extent of appel-
lant's right to the use of the waters of Little Cotton-
wood creek for power purposes, it was apparently assumed
by all the parties to this litigation that he has such a right.

Assuming plaintiff has the right so claimed, such right is satisfied when the water re-enters Little Cottonwood creek at the tailrace of his oxygen plant.

It is further urged that Murray City is seeking to avail itself of the natural declivity of plaintiff's land between the point where the city diverts the water from Little Cottonwood creek into its pipe lines and the place where its power plant is located. In a measure a similar argument is frequently applicable to water diverted for other useful purposes. If water is to be conveyed by gravity from the point of diversion to the place of use, some declivity in the land traversed is necessary to accomplish that end. Whether the value of the land sought to be condemned by Murray City for its diversion works and pipe line is or is not enhanced by its declivity need not concern us on the present appeal. The right or lack of right to make a filing on public waters of this state is not affected by the contour of the earth's surface at or near the proposed point of diversion. The right to the use of water is independent of the right to land. *Sowards* v. *Meagher*, 37 Utah 212, 108 P. 1112; *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479. Appellant must fail in his contention that a filing upon public water may not be made where the proposed point of diverting the water from the natural stream is on privately owned land.

It is next urged that Mr. Kimball committed trespass in making the filing here brought in question, and therefore, such filing is void. It will be noted that plaintiff was not the owner nor in the possession of the premises where, under the Kimball application, it was proposed to divert the waters from Little Cottonwood creek at the time the filing was made, or at the time it is claimed the first work was done at the proposed point of diversion. The fact, however, that plaintiff was not the owner of the property when the filing was made seems to be immaterial under the doctrine announced in the cases of *Prentice* v. *McKay* and *Marshall* v. *Niagara Springs Orchard Company*, supra.

There are, however, cases which hold or tend to hold that a water filing is not defeated merely because a trespass was committed in making the filing. *State ex rel. Ham* v. *Superior Court,* 70 Wash. 442, 126 P. 945; *Sternberger* v. *Seaton Min. Co.,* 45 Colo. 401, 102 P. 168, 169; *Patterson* v. *Ryan,* 37 Utah 410, 108 P. 1118.

However, in the view we take, it is not necessary to decide that question. The trial court found:

"That in preparing said application said Leland H. Kimball did not go upon said property but viewed the intended site of the dam and diverting works from the public road hereinbefore referred to, and fixed its location and the point of diversion in said application by means of a ruler applied to a large-scale map in his possession, the result of which was that the point of diversion as fixed in the application with reference to the west quarter corner of section 7, township 3 south, range 2 east, Salt Lake Meridian, was approximately 50 feet distant and off the creek from the point actually intended.

"The point actually intended was that at which the Murray City dam and diverting works and point of diversion were afterwards fixed and constructed. (Findings Nos. 14 and 15.)

The findings just quoted reflect the testimony of Mr. Kimball and there is no evidence to the contrary. The court had a right to and evidently did believe Mr. Kimball when he so testified. These findings being supported by the evidence, should not be disturbed by this court.

It is next urged that even if the filing was valid when made it ceased to be so after six months because actual construction work was not commenced within that time, or if any work was done at the point of diversion ■ within six months, such work was sham and frivolous and that a trespass was committed in doing the work, and hence any work that may have been done should be disregarded. The trial court found:

"That commencing on or about the 26th day of July, 1929, and continuing for four days thereafter said Leland H. Kimball caused to be dug, on the south bank of Little Cottonwood Creek, adjacent to and on the place where a part of the south portion of Murray City diversion dam was afterwards constructed, test pits and trenches and

caused trees, brush and willows to be cut therefrom and rocks to be moved.

"Said test pits and trenches, brush cutting and rock removal were necessary to the commencement of and did commence the actual construction of the dam and diverting works at that site, and the work done was of a character usually and necessarily done in the commencement of actual construction of the dam and diverting works thereafter there actually constructed, and said work was done in good faith for the purpose of complying with the requirements of law and the requirements of the State Engineer with respect to the commencement of actual construction.

"That in addition to the digging of said test pits and trenches, cutting of brush and trees and the removal of rocks, said Leland H. Kimball for the purpose of commencing the construction of the dam and diverting works at said site prepared plans and did other necessary engineering work of a value of not less than $1,500.00." (Findings Nos. 19, 20 and 21).

The trial court had the advantage of seeing and hearing the witnesses while they were testifying and hence was in a better position to give proper weight to their testimony than is a reviewing court. We have carefully read the evidence with that fact in mind and are of the opinion and so hold that the findings of the trial court touching the work done should not be disturbed.

Error is also assigned because of the finding to the effect that the work performed in July, 1929, was not on the property which at the time of the trial was in the possession of appellant under his contract of purchase. The trial court found:

"That the relative situation of said property, public road, creek, railroad property, Lots 4 and 5 of Wasatch Resort, and said dam and diverting works, is shown on the following map marked Exhibit A and made a part of these findings."

"That none of the work mentioned and referred to in Findings 20 21 was done upon said property, nor did anyone in accomplishing it go upon the same." (Findings Nos. 10 and 22.)

There is evidence tending to support the findings just quoted. On cross-examination plaintiff testified that there were several small lots fronting on Little Cottonwood creek

on the south side thereof which were not covered by his contract of purchase. The testimony of Randle and Heist tends to show that the work done in July, 1929, under the direction of Kimball was upon property over which the Denver & Rio Grande Railroad Company had a right of way. Exhibit A, which is attached to the finding and made a part thereof, shows that lots 4 and 5 of the Wasatch Resort abut on Little Cottonwood creek on the south side thereof at the point where the work was done in July, 1929. The same facts appear upon a plat attached to an abstract of title which was received in evidence as Defendant's Exhibit 7. There is no evidence to the contrary. Neither is there any evidence touching the question of whether Kimball did or did not secure the consent of the Denver & Rio Grande Railroad Company or the Wasatch Resort for permission to do the excavating which was done in July, 1929. It may fairly be implied from the evidence that no one, other than plaintiff, was in the least concerned with the work done under the direction of Kimball in 1929.

While the evidence is not entirely satisfactory as to who owned the land where the work was done in July, 1929, such evidence as there is in the record tends to show that plaintiff had no interest in such land either at the time it was done or at the time of the trial. In such case it was no concern of the plaintiff whether the work was done with or without the consent of the owner.

The judgment appealed from should be and it accordingly is affirmed. Costs to respondents.

FOLLAND, EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.